2023 IL App (1st) 211421
No. 1-21-1421
Opinion filed February 22, 2023

FIRST DISTRICT
THIRD DIVISION

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 16 CR 1674701 |
| | ) | |
| ROBERT MOORE, | ) | Honorable |
| | ) | James Michael Obbish, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE D.B. WALKER delivered the judgment of the court, with opinion.
Presiding Justice McBride and Justice Burke concurred in the judgment and opinion.

**OPINION**

¶ 1     Defendant Robert Moore appeals his conviction after a jury trial for armed robbery with a firearm and his sentence of 45 years' imprisonment. On appeal, defendant contends (1) the State failed to prove he committed armed robbery beyond a reasonable doubt where no firearm was recovered or presented at trial and eyewitness testimony described the firearm as an "old school" or "cowboy" style weapon, (2) he was denied a fair trial where the trial court improperly admitted evidence of other crimes and refused to excuse a juror who formerly worked with a State witness, (3) the trial court abused its discretion in refusing his request for standby counsel, (4) the trial court's conduct throughout the proceedings indicated severe bias that denied him a fair trial, and (5) his 45-year sentence was an excessive trial tax. For the following reasons, we affirm.

¶ 2                                    I. BACKGROUND

¶ 3      The State charged defendant in Cook County circuit court with two counts of armed robbery with a firearm and two counts of aggravated unlawful restraint in connection with an incident that occurred on April 4, 2016, in a Family Dollar store located at 51 East 71st Street in Chicago.

¶ 4                                    A. *Pretrial Proceedings*

¶ 5      At a hearing on June 29, 2017, defendant informed the court that he wanted to file a motion against his appointed counsel. He and counsel "got into an altercation," and counsel was "saying stuff *** like he's the prosecution, like he's working for the prosecution." Counsel also sent a letter advising defendant to "cop-out" because he could receive a natural life sentence if convicted. Counsel, who had not seen the motion, expressed concern that it may disclose privileged information to the State. When the court pointed out that his attorney was trying to protect him, defendant responded that he did not trust counsel. This exchange followed:

"THE COURT: He's been in front of me about two years I've seen him work - - -

DEFENDANT: I'm not going to argue with you about me trying to file something in the courts, I just told you I wanted to file this with the Court.

THE COURT: If you want to file the motion, you can file the motion regarding the attorney, but with respect to any other motions that deal with your case, I don't think you have the right to file *pro se* motions on aspects of your case. ***

DEFENDANT: I've been here eight months, and he ain't filed not one thing.

THE COURT: You're wrong about that.

DEFENDANT: He hasn't.

* * *

> THE COURT: *** [The] motion I'll consider is your motion regarding his representation, that's the motion I'll allow you to file. So pick that one out - - -
>
> DEFENDANT: All that's the same.
>
> THE COURT: Let me pass it. Give all the motions to your lawyer so he can try to just make sure the appropriate one is filed.
>
> DEFENDANT: I want you to understand—
>
> THE COURT: Number one, you don't talk when I'm talking.
>
> DEFENDANT: I'm going to—
>
> THE COURT: You don't talk when I'm talking. Take him out of here.
>
> DEFENDANT: You b***. I don't care.
>
> THE COURT: Oh boy, you're a tough guy. You're a tough guy, aren't you, Mr. Moore?
>
> DEFENDANT: You can't tell me I can't file nothing."

¶ 6    After reviewing defendant's motion, the court found no basis to appoint an attorney other than the public defender. The court informed defendant that the State wanted to introduce evidence of prior crimes, and his counsel planned to file a motion to preclude such evidence at trial. The court understood defendant's frustration but advised him to let counsel "do his job."

¶ 7    On July 24, 2017, defendant attempted to file a *pro se* motion to quash arrest and suppress evidence. The court scheduled the motion for consideration on the next court date.

¶ 8    On August 21, 2017, defense counsel informed the court that he discussed the *pro se* motion with defendant. They agreed to work as a team, and counsel would file the motion at a later date. "[A]t this time there is nothing to be said on that motion and we are not asking to file." Counsel then asked defendant, "Is that correct? Is that our position?" Defendant answered, "No. I

am asking to file it." The court ruled that it would withdraw defendant's *pro se* motion and allow counsel to file the motion. On September 29, 2017, a new attorney from the public defender's office appeared on behalf of defendant.

¶ 9     On November 2, 2017, a third public defender appeared for defendant. She informed the court that defendant wanted to proceed *pro se*. The court advised defendant to "think long and hard about making such a choice" because those that choose self-representation "end up giving away more than [they] ever gained." The court, however, would honor defendant's decision.

¶ 10     At a hearing on February 1, 2018, defendant informed the court that he wished to proceed *pro se*. The court admonished defendant about the risks of representing himself, including his inability to raise an ineffective assistance of counsel claim on appeal, and warned that he would not receive special consideration or extra time to prepare. Also, the court would not appoint a public defender or any attorney to assist him during the trial. The court reviewed each charge against defendant and reminded him that, if convicted, he faced a potential sentence of mandatory natural life in prison. The court continued:

> "Q. And you want to avoid that, I assume?
>
> A. Yes. If I beat my case, yes.
>
> Q. But if you don't beat it.
>
> A. I understand the consequences.
>
> * * *
>
> Q. Do you understand, Mr. Moore, presenting a defense is not a simple matter of just telling your story, you would have to adhere to all the various technical rules that govern the conduct of any trial. Do you understand that?
>
> A. Yes, sir.

Q. Do you understand that when you're represented by an attorney the lawyer \*\*\* already has substantial experience and training in various trial procedures and the prosecutor's office that would be trying to prove your guilt and put you in the penitentiary for the rest of your life, they in fact will be represented by experienced attorneys. Do you understand that?

A. Yes.

Q. Do you understand that because you as a layman and not a lawyer might very well be unfamiliar with legal procedures. You might end up allowing the prosecution [ ] to have an advantage because you failed to make objections to what might arguably be inadmissible evidence. You might not make effective usage of certain rights that you have \*\*\* and you might also make tactical decisions that could produce unintended consequences. Do you understand that?

A. Yes, sir.

\* \* \*

Q. Do you understand that you will not receive any special considerations from the Court merely because you are a nonlawyer. You would be expected to act in the courtroom as if you were in fact a lawyer. Do you understand that?

A. Yes, sir.

Q. Do you understand you don't receive any extra time for preparation or any greater library time to prepare your defense should you be representing yourself?

A. Yes, sir.

Q. Do you understand that an attorney can render very important assistance to a client. An attorney can determine the existence of a possible defense to the charges against

you through consultations with the prosecutor. The attorney might be able to obtain a reduced charge or a lesser penalty. ***

A. Yes, sir.

Q. Do you understand that if I do accept your decision to represent yourself then you will not be given the opportunity to change your mind during the course of or on the eve of trial?

A. Yes, sir.

Q. Do you understand, sir, that I would not appoint the Public Defender's office or any other attorney to assist you during the course or any stage of this trial if you choose to dismiss them as your attorney?

A. Yes, sir.

* * *

Q. Any questions about any of the things that I have said to you?

A. No, sir.

Q. Knowing all of those risks that you run and knowing that you face the potential penalties described including a mandatory natural life sentence if you're convicted of either count of armed robbery, is it still your decision to dismiss the Office of the Public Defender and represent yourself in these proceedings?

A. Yes, sir."

¶ 11 The trial court found that defendant knowingly and voluntarily exercised his right "to discharge his appointed counsel and represent himself in these proceedings."

¶ 12    On March 9, 2018, the trial court allowed defendant to withdraw his request to proceed *pro se*, and private counsel filed an appearance. On May 23, 2018, counsel informed the court that defendant no longer wanted him as his attorney. The court questioned defendant:

"Q. Oh, oh, oh, okay. All right. Mr. Moore, what's the problem?

A. The problem is that I be asking him to do certain things and he keep denying me motions. He said we don't have no motions to file. Not one motion. And I know for a fact we got motions to file.

Q. What motions do you want him to file?

A. The identification motions, suggestive motion, perjury motions. And he is telling me that we don't no [*sic*] motions to file and I read over all this stuff. \*\*\*

Q. Well, if you have a problem with Mr. Himel here, how do you anticipate resolving it? Are you going to [hire] a different lawyer?

A. I'll represent myself and file my own motions and argue my own motions. Because if he saying he is not going to file my motions and I know we have motions to be filed, that's—I can't accept that. And we have fourth amendment rights violation motions.

Q. Can you afford to hire a lawyer to represent yoursel[f]?

A. No.

Q. If Mr. Himel is allowed—you don't want Mr. Himel to represent you. He is obviously not going to force himself upon you to continue to represent you against your wishes.

A. Yes, sir.

\* \* \*

Q. Would you be asking me to appoint the Public Defender's Office to represent

you?

A. No, sir.

Q. You think it would be better to represent yourself?

A. Yes, sir."

¶ 13    Defendant had no objection to his attorney withdrawing from the case. The court referred to its admonishments in February and asked defendant whether he had questions about his rights and obligations when representing himself. Defendant answered, "No, sir." Defendant, however, requested more time in the law library and standby counsel for "investigation" and "talking to witnesses." The court reminded defendant that he would not receive special library privileges. Regarding his request for standby counsel,

"[t]hat was discussed with you on February 1st, as well sir. And I indicated to you

at that time that I would not be appointing stand-by counsel for you should you choose to

represent yourself. You have had appointed counsel and you have had retained counsel.

And for some reason, I don't need to understand, you keep rejecting lawyers. But then you

just want people to do what you apparently *** think they should do even though they are

the skilled lawyer and you're not.

Anyway, no, you will not get stand-by counsel."

¶ 14    On the next court date, defendant stated that he required more time to file his motions because he hit his head while working in the kitchen and was in "health care" for two days. While in health care, all of defendant's property, including his motions, was lost. After a discussion with defendant, the court set July 25, 2018, as the date to file his pretrial motions. On that day, defendant

filed five motions including a motion to quash arrest and suppress evidence and a motion to dismiss based on evidence destruction.

¶ 15    At a hearing on October 25, 2018, defendant inquired about video from the Family Dollar store recorded on the day of the incident. The State responded that the video did not exist because Family Dollar has a 30-day retention policy concerning surveillance videos and the incident occurred in 2016. The court asked the State to ascertain whether the police obtained a copy of the video.

¶ 16    The court was subsequently informed that Family Dollar did not save the video and that it was never in the State's possession. Although the investigating detective viewed a surveillance video from the store, he never obtained a copy of the video from the store's district manager. The State offered to have the detective testify on the issue in court. The court responded, "You've got video from an armed robbery in the store, and the video is not collected? I mean, it may not be a due process violation, but for crying out loud. Really. That's going to be fun, to justify that." Since the police never had the video in their possession, the court denied defendant's motion to dismiss the indictment based on the destruction of evidence.

¶ 17    On February 8, 2019, the court heard testimony from Officer Tyrone Jackson regarding the surveillance video. Officer Jackson testified that on April 4, 2016, he investigated an armed robbery at a Family Dollar store on East 71st Street. He viewed surveillance video at the store, but to obtain a copy he was required to submit a request to a "central location." Officer Jackson e-mailed the person that the manager told him to contact, but that person "never complied with it." The Chicago police video recovery section tried, unsuccessfully, to download the video from the store. The police department never had custody of the video.

¶ 18 At the hearing, the trial court also ruled on defendant's motion to quash arrest and suppress evidence. The court denied his motion to quash arrest because there was probable cause to arrest defendant. It noted that, before defendant's arrest, at least one witness positively identified him in a photo array and his fingerprints were found on items at the crime scene. The court denied his motion to suppress evidence because defendant "has no evidence to suppress." Police collected defendant's fingerprints and assembled the photo array before his arrest, and they did not have a copy of the Family Dollar store video.

¶ 19 On April 1, 2019, the trial court heard the State's motion to admit other-crimes evidence. The State sought to admit evidence of two prior armed robberies defendant committed in 1997 and 11 armed robberies committed between September 17, 2007, and December 1, 2007. The State argued that, although a lengthy period separated defendant's convictions in 1997 and his present 2016 conviction, defendant was in prison for most of that time. He was paroled in June 2015 for his 2007 convictions, only 9 or 10 months before he committed the present offense.

¶ 20 The State also argued that defendant's prior armed robberies were factually similar to the 2016 offense. All of the robberies occurred in businesses on the southwest side of Chicago, and 11 of the 13 offenses occurred at a Family Dollar store. Defendant used a firearm in 12 of the 13 robberies, and in most cases, he pointed the weapon at the clerk and demanded money.

¶ 21 Defendant argued against admission of the evidence because the crimes were committed many years ago and the evidence would prejudice him.

¶ 22 The trial court found the 1997 convictions, which involved a second offender, "too old." One 2007 case also involved a second offender. The court ruled that these cases were not factually similar to the 2016 offense and should not be admitted. However, the remaining 2007 cases showed that "defendant has created his own cottage industry of using a firearm to rob various Family

Dollar stores on the south side of the city of Chicago." By his own actions, defendant "could be identified or labeled as the Family Dollar armed robber."

¶ 23    The court further found that the jury was not likely to convict defendant based solely on his prior convictions, where fingerprint evidence connected him to the crime and at least one eyewitness positively identified him as the offender. The trial court allowed the State to select four 2007 convictions to show *modus operandi* and identity in the present case.

¶ 24    The trial court also denied defendant's request for standby counsel "to get in contact with experts" on fingerprints. The following exchange occurred:

"DEFENDANT: I don't need standby counsel for my case. I need standby counsel to be able to get in contact with experts. Because of the phone situation, it is impossible for me to get anybody.

THE COURT: Geez, too bad somebody didn't tell you that at the time you decided to go *pro se*. Wait a minute. I did.

Come on, Mr. Moore. You are playing games now. I told you no standby. You are not going to get any help on this. If you want to be your own lawyer, then you are your own lawyer. Good for you. ***

DEFENDANT: How would I get an expert?

THE COURT: I am not your lawyer. Go ask your lawyer. Go ask your legal genius in jail who is writing these motions for you.

DEFENDANT: I demand trial.

THE COURT: Demand trial?

DEFENDANT: Yes, sir.

THE COURT: All right. When do you want it? Jury?

DEFENDANT: Yes.

THE COURT: Absolutely.

DEFENDANT: It is impossible for me to get an expert.

THE COURT: Give it a short date. Check on status.

DEFENDANT: A speedy trial too, your Honor, for the record.

THE COURT: Check on a status date when your witnesses are available and then we will set it.

DEFENDANT: Your Honor, I demand speedy trial today.

THE COURT: Okay. How many times do you think you have to say it?

DEFENDANT: I am just making sure.

THE COURT: Yeah, okay. It's not going to get any speedier because you say it three times, Mr. Moore. Just more irritating.

DEFENDANT: I know."

¶ 25 On April 15, 2019, the trial court asked defendant if he was ready to set a date for trial. Defendant answered, "Yes. I have been ready on the first." With the State's agreement, the court set May 20, 2019, as the date for defendant's jury trial. The court also arranged to have civilian clothes for defendant to wear during the trial.

¶ 26 On May 20, 2019, the State answered that it was ready for trial. Defendant, however, was not ready because he wanted to ensure that certain State witnesses would testify at trial. The court told defendant that he could cross-examine any witness called by the State, but he could not force the State to call witnesses. The court also reminded defendant that he demanded a speedy trial. It had called off another jury trial and continued a motion hearing so defendant's trial could begin

that day. Without the court's assurance that certain witnesses would be called to testify, defendant objected to the proceedings.

¶ 27 The State then extended an offer to defendant of 15 years' imprisonment if he pled guilty to aggravated robbery. Under the terms of the offer, defendant would not be eligible for a mandatory natural life sentence, and he would earn a sentence credit for each day of good time served in custody. The trial court explained that the sentencing range for defendant's present charge was 6 to 30 years' imprisonment, and he would be getting a sentence of 15 years. "And significantly, the sentence would be served at the rate of 50 percent." Defendant indicated that he understood, but he rejected the offer. The court noted defendant's objection and scheduled the case for jury selection later that afternoon.

¶ 28 Defendant continued to object to the proceedings. He argued that he wanted to cross-examine Detective Marshall about his interrogation of defendant. The court explained that the State would not call the detective as a witness, nor would it introduce defendant's statement to the detective as evidence. Defendant maintained that he should be able to call Detective Marshall as a witness.

"DEFENDANT: So I can't call him as a witness?

THE COURT: That's your law school education for the day, Mr. Moore.

DEFENDANT: I can't call him as a witness and—a subpoena purpose? You're telling me—

THE COURT: What would he testify to? Your statement?

DEFENDANT: No. He'd testify to—

THE COURT: What would he testify to if you called him?

DEFENDANT: To the grand jury—the grand jury testimony that he gave that was perjury.

THE COURT: That's not even going to come into evidence.

DEFENDANT: But I still have to—I still have the—I still can be able to cross—

THE COURT: No, no, no.

DEFENDANT: Why wouldn't I? Why wouldn't I, your Honor?

THE COURT: Because it's not admissible. It's not admissible. A legal giant, like yourself, should know that, Mr. Moore. That's why you wanted to represent yourself.

DEFENDANT: I'm not—

THE COURT: That's like telling you what you would learn day one of law school.

DEFENDANT: I'm—

THE COURT: Pass the case. Get ready for your jury, sir. We'll have them here hopefully around 1:30.

DEFENDANT: Don't worry about it. I ain't coming out then.

THE COURT: No? Well, you can be tried in absentia, sir.

DEFENDANT: Yeah, I know. You just denied me my right as a witness."

¶ 29   As defendant left the courtroom, he smashed the glass window of the door leading from the courtroom to the lockup. After receiving treatment on his fingers and elbow, defendant appeared in the courtroom for jury selection.

¶ 30                                    B. *Trial*

¶ 31   At trial, Temika Mints testified that on April 4, 2016, she worked as a cashier at the Family Dollar store located on 71st Street and Wabash Avenue. Also working that day was manager Darlene Salter and another employee, Clara Pratt. Around 8 p.m., a man entered the store wearing

a hood. Per store policy, Mints asked him to remove his hood. He asked where he could find oatmeal cream pies, and Mints directed him to aisle 10. He returned to the counter with a box of oatmeal cream pies as Mints attended to another customer.

¶ 32     When he approached the counter, he mumbled "give me the m***f*** money." Mints told him she did not understand, so he repeated his demand. Mints described the offender as "real anxious" with "bucking" eyes. The woman in front of him asked if she could leave, and she ran out of the store. Mints did not know her name, and she never saw her again.

¶ 33     Mints tried to get money out of the cash register, but she was nervous and could not open it. As Mints tried to open the register, the offender told her that, if she wanted to see her children, she needed to give him the money. Mints looked at him as he unzipped his coat with his right hand. His left hand was inside his coat, and Mints "could see a gun, like a barrel" in his left hand.

¶ 34     Salter approached the cash register to assist Mints. Pratt, who was in the back of the store, was unaware of the events in front. Mints eventually opened the cash register, and the offender took about $200 with his right hand. His left hand remained in his jacket holding the firearm. The offender then ran out of the store.

¶ 35     On October 12, 2016, Mints viewed a photo array at the police station. She identified the offender in the photo array but thought he was "smaller" in weight and build. Otherwise, he was the same person. Mints was confident in her identification but acknowledged that she told detectives she was not sure because of the size difference. Mints identified defendant in court as the person she selected in the photo array.

¶ 36     On cross-examination, Mints stated that she described the offender to police as five foot, five inches or five foot, six inches tall. Defendant asked if Mints knew he was actually over six

feet tall, and the trial court sustained the State's objection. Defendant then attempted to ask Mints about surveillance video from the store.

> "Q: [D]id you know Detective Jackson looked at the surveillance video the night of the robbery?
>
> A: I'm not sure.
>
> ASSISTANT STATE'S ATTORNEY: Objection.
>
> THE COURT: The answer may stand.
>
> Q. You're not sure. Do you know did he make a statement—
>
> THE COURT: That's going into an obviously objectionable question about what she knows."

¶ 37    Salter testified that on April 4, 2016, a tall black man entered the Family Dollar store wearing a black hoody and black jeans. Mints was talking to the man, and Salter, who was 10 feet away, noticed that Mints looked scared. By the expression on Mints' face, Salter knew that a robbery was occurring. She walked to Mints and saw that the man "had a gun pointed to us." He said, "give me the m*** f*** money." Salter was within arm's length of the man, and nothing obstructed his face. She identified the man in court as defendant.

¶ 38    Salter observed that Mints' hands were "shaking" as she tried to press the code to open the cash register. Salter told defendant that she would "help [him] get this money." She tried to open another register, but her hand was shaking. When Mints finally opened the register, Salter "grabbed everything" and gave it to defendant. He took approximately $203. Salter testified that defendant had the firearm in his left hand as he pointed it at her and Mints. She described the weapon as "an old school gun, like a cowboy gun," which defendant held in his left hand under his coat.

¶ 39    On cross-examination, Salter stated that she had contact with defendant in December 2018 via a three-way phone call with him and a woman. The woman told Salter that her man was "locked up" and he was "trying to clear his name" regarding a robbery at the Family Dollar store. The trial court interrupted:

> "THE COURT: Let me stop you. Let me just stop you. This is—I don't know if this is new information to the State or not. Is there an objection? I mean I'm not suggesting there should be one, but.
>
> ASSISTANT STATE'S ATTORNEY: He asked the question, Judge, I mean.
>
> THE COURT: All right. Do you want her to continue with the answer?
>
> DEFENDANT: Yes, yes."

Salter stated that defendant contacted her twice, but he did not threaten her. However, Salter thought defendant was "tampering with the evidence" because he was "not supposed to reach out to a person [he] robbed over the telephone." The court suggested that defendant "move on to a different line of questioning," and he agreed.

¶ 40    Defendant asked Salter about the location of video cameras in the store. When defendant mentioned photos he had viewed, the State objected, arguing that defendant was "talking about pictures that are not in evidence." After confirming with the State that there was no video to show the jury, the court addressed defendant:

> "We are spending an inordinate amount of time talking about issues that aren't helping. The issue of the lack of video, you can use that, it's relevant, you can establish it, but I think to just go on and on and on about what's on the video when nobody is going to be able to see the video because apparently it wasn't—it doesn't exist any more is a waste of time, Mr. Moore.

So I think you need to move on to a different subject. We don't need to know where the different camera angles are because [it's] not going to help the jury because they are never going to see the video of what the cameras might have captured. So let's move on to something else.

The State's already told you and everybody else in their opening statement there is no video. I think you're well aware of it. This case has been pending since 2016, so you're well aware of it.

Let's move on and to something else that's relevant so we don't waste this jury's time and the witness's time. We've got more witnesses to put on."

¶ 41    Salter testified on cross-examination that she viewed the store's surveillance video after the incident and noticed that defendant had entered the store earlier in the day. Salter was also aware that police contacted the district manager of Family Dollar to obtain a copy of the video. Salter could not make copies of the video.

¶ 42    Defendant then asked Salter about a report filed by Detective Jackson. The State objected because "this witness did not write any reports." The court sustained the objection, telling defendant, "If you don't have any more questions, I'm going to excuse the witness. We're not [*sic*] going to move on. I'm not going to wait all day for you to ask objectionable questions. Are you done?" Defendant stated that he was finished.

¶ 43    Detective Jackson testified that on April 4, 2016, he spoke with Mints and Salter at the Family Dollar store. He obtained a description of the offender as a black man in his thirties, wearing a black and white coat and a baseball cap. An evidence technician lifted fingerprints from items the offender touched and submitted the prints to the latent print unit of the Chicago Police Department. From the fingerprints, Detective Jackson had a name and date of birth.

¶ 44    After obtaining a photo based on this information, Detective Jackson assembled a photo array. Detective Curtis Mitchell showed the arrays to Mints and Salter, separately, on October 12, 2016. Both identified defendant as the offender.

¶ 45    Detective Jackson testified that he never obtained the surveillance video from the store. He e-mailed the person Salter told him to contact, but the person never responded. The video recovery team in the police department also tried to obtain a copy of the video but was unsuccessful.

¶ 46    On cross-examination, Detective Jackson stated that witnesses described the offender as between five feet, eight inches and six feet tall. He could not see the offender's face in the video. The detective did not recall if Salter said the offender was in the store earlier in the day. Mints told him that the offender pulled his gun "completely" out of his jacket.

¶ 47    Defendant attempted to ask Detective Jackson about a progress report he completed, and the detective wanted to see the report to refresh his recollection. The court asked defendant if he had the report:

"DEFENDANT: No, Your Honor. They never turned it over to me.

THE COURT: All right.

ASSISTANT STATE'S ATTORNEY: Yes, we—

THE COURT: You know what, Mr. Moore?

DEFENDANT: This is what I said.

THE COURT: I warned you about playing these games where you're pointing fingers at the State and making allegations like that. That's improper.

* * *

DEFENDANT: Let me—

THE COURT: Just stop it, Mr. Moore.

- 19 -

DEFENDANT: Can I say something, Your Honor?

THE COURT: Stop it. If you have a report that would refresh the Detective's recollection, produce it.

DEFENDANT: Your Honor, I have a report they redacted. The only reason I found—

THE COURT: All right. If you have the report, provide it to Mr. Elmer there, and he'll show it to the Detective and then we can ask the Detective if it refreshes his recollection.

DEFENDANT: What I'm saying is, Your Honor, it's redacted.

THE COURT: Stop it. You don't just get to blabber on and on in front of the jury."

¶ 48     Defendant then asked Detective Jackson several questions the court would not allow him to answer. First, he asked the detective about the circumstances of Mints' and Salter's identification of him from the photo array, which the court disallowed because the detective was not present for their identifications. Next, defendant asked about the contents of the surveillance video, which the court found improper because the video was not in evidence. Defendant then asked Detective Jackson about the length of time of the incident. The court responded:

"All right. He wasn't present for the incident. He can't testify to how long the incident took place.

All right. You're kind of asking questions and just going around in circles without ever getting to a particular point. So if you don't change your line of questioning to something that's going to be relevant and material to the issues in the case, Mr. Moore, I'm going to have to stop your cross-examination."

¶ 49    Evidence technician Patrick Doyle testified that he processed the crime scene and spoke with Mints. After their conversation, Doyle processed "a box of cookies" on the counter for fingerprints. He found two latent prints on the box and identified People's exhibit Nos. 13-16 as photographs of the prints. He inventoried the prints and submitted them to the lab. Doyle did not analyze the fingerprints.

¶ 50    Fingerprint technician William Kovacs testified that he collected an inked fingerprint card from defendant and sent the card to Officer Michael Jones for analysis.

¶ 51    Officer Jones, an expert in latent prints, analyzed the latent fingerprints taken from the cookie box. He submitted the prints into the Chicago database and received 10 candidates with possible matches. The system ranks candidates based on the similarity of their prints compared to the submitted impressions. Defendant, the first individual listed, was a match.

¶ 52    Jones stated that "lift A" was "a very good quality latent impression" because he could see all three levels of detail down to the pores. Regarding "lift A," he determined that the "friction ridge" visible in both the latent print and defendant's inked card "originated from the same source. And the possibility or the chance of another individual having the same friction ridge skin is so low that it's almost impractical." Officer Jones testified that the print belonged to defendant. Specifically, it was a print from defendant's right index finger. His conclusion was verified by another analyst.

¶ 53    The State presented testimony from three witnesses regarding defendant's prior crimes. Before each witness testified, the trial court instructed the jury that it should consider the testimony only for defendant's identification, intent, motive, and *modus operandi*.

¶ 54    Tizzie Holmes testified that on October 7, 2007, she worked as a cashier at the Family Dollar store at 5501 S. Halsted Street in Chicago. Around noon, Holmes saw a man enter the store.

She recalled that he had come into the store earlier in the day. On that earlier occasion, the man walked around the cash register "like he was going to purchase some items, but he never did." Holmes described him as tall and thin with short hair and dark skin. She identified defendant in court as that man.

¶ 55 Holmes testified that, when defendant returned to the store, he walked to the cash register and held out a firearm. He nodded at Holmes "like he wanted the money." Holmes had an unobstructed view of defendant's face, and he wore no face covering. After defendant took the money, he left through the front door.

¶ 56 On October 27, 2007, near closing time, Holmes was working at the same Family Dollar store when defendant entered with a firearm. Holmes opened the safe and gave him the money because she "knew what he was there for." She recognized him as the same offender who robbed the store on October 7. Holmes later identified defendant in a lineup as the offender. On cross-examination, Holmes stated that defendant ordered her to put the money in his bag and that he did not bring merchandise to the register.

¶ 57 Cherise Lile testified that on November 10, 2007, she was the manager of the Family Dollar Store located at 7340 S. Ashland Avenue in Chicago. Around 7:48 p.m., Lile saw a man she identified in court as defendant holding a gun to her cashier. She described him as a black man, six feet tall, with a distinct jawline. Lile was shaking so she had difficulty retrieving the money from the register. Defendant said, "Do you think I'm playing with you, b***?" Lile panicked and dropped to her knees. Defendant then ordered everyone to go to the back of the store. They ran outside through the back door and called the police. On cross-examination, Lile stated that defendant wore a blue jacket with white stripes and "he had his hood on."

¶ 58   Luna Rush testified that on November 21, 2007, she worked as a cashier at the Family Dollar store on 59th Street and Ashland Avenue in Chicago. Shortly before closing at 7 p.m., a man Rush identified as defendant entered the store to purchase baby clothes. After looking around for 20 to 30 minutes, he approached the register with the clothes. Defendant "pull[ed] his jacket up and put his finger to his mouth." When defendant lifted his shirt, Rush saw the handle of a gun. He did not display the gun or point it at Rush. Defendant asked for money and took $500 to $600 from two registers.

¶ 59   On cross-examination, Rush stated that she gave a description of the offender and identified defendant in a lineup two weeks later. She could not recall the details of her description, but she said, "I know your face when I see it. And it's been 12 years and yes that was you that came in there and did that to me." Rush stated that defendant lifted his jacket and showed her "the barrel of a gun." Defendant put his finger to his mouth and told her not to scream.

¶ 60   The State rested at the conclusion of this evidence, and defendant chose not to testify.

¶ 61   Outside the presence of the jury, the trial court discussed jury instructions with the parties. The court told defendant that he needed to have his instructions ready the next morning, or he could tell the State which instructions he wanted. This exchange followed:

"DEFENDANT: Okay.

THE COURT: If you tell the State which ones you want—do you want the instruction that—

DEFENDANT: I've got it.

THE COURT: Do you want the instruction that says they can't consider the fact that you did not testify?

DEFENDANT: Yeah. I got them wrote down.

- 23 -

THE COURT: Did you ever just answer a question.

DEFENDANT: Uh?

THE COURT: Uh? Boy, that's not an answer. That's the only answer that you're really good at is uh.

DEFENDANT: What's wrong with you? You okay? You can't talk to me like that.

THE COURT: Mr. Moore.

DEFENDANT: Don't talk to me like that because I don't talk to you like that.

THE COURT: Don't talk to you like that? I'm—

DEFENDANT: Don't talk to me like—

THE COURT: When I ask you a simple question—

DEFENDANT: Don't talk to me like that, though. I don't talk to you—

THE COURT: And then you just give me uh. All you do is give me uhs back, sir.

DEFENDANT: Like I said, don't talk to me like that. I'm not a kid. I'm a grown man.

THE COURT: A kid wouldn't be as foolish as you have been—

DEFENDANT: Don't talk to me like that.

THE COURT: —in representing yourself the way you have, Mr. Moore.

DEFENDANT: It don't even matter what I want to do. I ain't take no time for something I ain't do.

THE COURT: All right. I don't blame you. I wouldn't take time for something I didn't do either.

DEFENDANT: Yes. I would like that jury instruction, Your Honor.

THE COURT: About not testifying?

DEFENDANT: Yes.

THE COURT: All right. See now how simple that is. That's all you had to do is answer my questions."

¶ 62    After closing arguments, the jury found defendant guilty of armed robbery with a firearm.

¶ 63    On September 20, 2019, the trial court granted defendant's request to appoint counsel for posttrial proceedings. Counsel subsequently filed a motion for substitution of judge for cause, arguing that the trial court's treatment of defendant before and during trial indicated prejudice against him. The judge hearing the motion reviewed the transcripts and found "that the totality of the circumstances indicate that [the trial court] bent over backwards, actually, to give the defendant a fair trial." He believed the trial court would "do the same" regarding posttrial motions and sentencing. Therefore, the judge denied the motion and returned the case to the trial court.

¶ 64    Posttrial counsel filed a motion for a judgment notwithstanding the verdict or alternatively, a new trial. Counsel argued, *inter alia*, that (1) the evidence was insufficient to convict defendant beyond a reasonable doubt, (2) improper admission of other-crimes evidence constituted reversible error, (3) defendant was not properly admonished regarding his choice to represent himself, (4) certain relevant evidence, such as the cookie box, was unavailable to defendant, (5) the court erred in allowing a juror who knew one of the witnesses to remain on the jury, and (6) defendant "was denied his constitutional rights because of the court's treatment of him during the pendency of this case."

¶ 65    After hearing argument, the trial court denied the motion. As the court discussed a date for the sentencing hearing, defendant interrupted:

"DEFENDANT: So you telling me that a victim tells you he five-five, five—five-five, and how the f*** I got found guilty? How the f***? You knew you—you got them on the video to the f*** store.

THE COURT: All right.

DEFENDANT: You don't have the f*** box to the f*** store. How the f*** this sh*** ain't inventoried? F*** you talkin' about?

THE COURT: Please get closer to him. I don't want—

DEFENDANT: I ain't going to (unintelligible) no mother*** (unintelligible). How the f*** you ain't got no (unintelligible) and y'all find me guilty?

THE COURT: Take him out of the courtroom. Put him in the lockup.

DEFENDANT: F*** is that—

THE COURT: Take him out of the courtroom."

¶ 66   At defendant's sentencing hearing, the trial court noted the recent amendment of the sentencing statute. Under the new provisions, defendant was no longer eligible for a mandatory natural life sentence. Defense counsel informed the court that defendant wished to be sentenced under the amended statute. Without objection from the State, the court granted defendant's request.

¶ 67   Before imposing defendant's sentence, the court considered the mitigating circumstances outlined in the presentence investigation report. Defendant had a difficult childhood but now had a partner and worked to help support her children. However, the court could not ignore defendant's background. It had "never seen anybody with more armed robbery convictions" than defendant. Although the court declined to apply extended-term sentencing because defendant did not fire the weapon and no one was injured, it found the maximum sentence for a Class X offense plus a 15-year firearm enhancement was appropriate. The court sentenced defendant to 45 years'

imprisonment followed by three years of mandatory supervised release. Defendant filed a motion to reconsider sentence, which was denied. Defendant now appeals.

¶ 68                                    II. ANALYSIS

¶ 69                              A. *Sufficiency of the Evidence*

¶ 70     Defendant first contends that the State did not prove he committed armed robbery beyond a reasonable doubt where no gun was recovered or presented at trial and the testimony of Mints and Salter was insufficient to show that he was armed with a firearm.

¶ 71     When a defendant challenges the sufficiency of the evidence used to convict him, we determine whether, when viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Smith*, 185 Ill. 2d 532, 541 (1999). This standard "applies in all criminal cases, whether the evidence is direct or circumstantial." *People v. Jackson*, 2020 IL 124112, ¶ 64. The jury determines the credibility of witnesses and the weight to be given their testimony, and this court will not substitute its judgment for that of the jury on these matters. *People v. Brooks*, 187 Ill. 2d 91, 132 (1999). Defendant's conviction will not be overturned unless the evidence is so unreasonable, improbable, or unsatisfactory that there exists a reasonable doubt of defendant's guilt. *People v. Wheeler*, 226 Ill. 2d 92, 115 (2007).

¶ 72     Defendant was charged with armed robbery in that he took "property *** from the person or presence of another by the use of force or by threatening the imminent use of force" and that he carried "on or about his *** person or [was] otherwise armed with a firearm." 720 ILCS 5/18-1(a), 18-2(a)(2) (West 2018). For purposes of the armed robbery offense, "firearm" is defined by section 1.1 of the Firearm Owners Identification Card Act (FOID Act) (430 ILCS 65/1.1 (West 2010)), which provides that a firearm is " 'any device *** designed to expel a projectile or projectiles by

the action of an explosion, expansion of gas or escape of gas.' " *People v. Wright*, 2017 IL 119561, ¶ 71 (quoting 430 ILCS 65/1.1 (West 2010)). The provision specifically excludes items such as "any pneumatic gun, spring gun, paint ball gun," or certain BB guns. *Id.*

¶ 73 Here, the police did not recover a firearm, and no weapon was presented at trial. The only evidence supporting defendant's possession of a firearm was the testimony of Mints and Salter.

¶ 74 In *Wright*, our supreme court considered whether the testimony of an eyewitness was sufficient to convict a defendant of armed robbery when the police did not recover a firearm. In that case, the defendant was charged with armed robbery in that he, or a person he was accountable for, took property by force and was armed with a firearm. *Id.*

¶ 75 Martin Perez, the manager of a Bakers Square restaurant in Chicago, testified that on December 26, 2010, a man wearing a grey hoodie (the codefendant) entered the restaurant. *Id.* ¶ 9. The defendant, wearing a black hoodie, also entered the restaurant. *Id.* ¶ 10. When Perez asked if he could be of assistance, the codefendant lifted his shirt to reveal a black firearm tucked into the waistband of his pants. *Id.* ¶ 9. Perez testified that he had experience firing semiautomatic weapons and he believed the weapon was an actual firearm. *Id.* As Perez walked to his office, the codefendant followed behind him. Perez felt " 'something sharp' " in his back, which he thought was the firearm. *Id.* ¶ 10. The codefendant ordered Perez to open the safe and give him the money inside. *Id.*

¶ 76 Tsehayens Tsegaye and Michael Morina, employees who were in the restaurant with Perez, corroborated his testimony. Tsegaye testified that the codefendant "told her she was being robbed and lifted his shirt up to reveal the handle of a gun in his waistband." *Id.* ¶ 12. Morina stated that he observed the handle of the codefendant's firearm, which he believed was a " '9 millimeter pistol.' " *Id.* Morina observed that the defendant also entered the manager's office. *Id.*

¶ 77    Shortly thereafter, the police detained the offenders. The codefendant was found with a Bakers Square night deposit bag and a large amount of loose money, but no firearm was recovered. *Id.* ¶ 15. The police brought the defendant and his codefendant to the parking lot of the restaurant, where Perez identified the codefendant as the one with the gun and the defendant as the second offender. *Id.* ¶ 11.

¶ 78    On January 2, 2011, a citizen found a black BB gun near an area where one of the suspects was observed. *Id.* ¶ 20. No suitable fingerprints were recovered from the BB gun, and police could not tie it to the case. *Id.*

¶ 79    On appeal to the supreme court, the defendant argued that the State failed to prove him guilty of armed robbery with a firearm where witnesses briefly observed only the handle of a firearm and the codefendant could have possessed a BB gun, an item specifically excluded from the statutory definition of a firearm. *Id.* ¶¶ 69, 71.

¶ 80    The court held that, when viewing the evidence in the light most favorable to the State, a rational trier of fact could infer from the testimony of Perez, Tsegaye, and Morina that the codefendant was armed with a firearm, not the BB gun, while committing robbery. *Id.* ¶¶ 76-77. The court cited approvingly to *People v. Washington*, 2012 IL 107993, in which the victim testified that the defendant pointed a firearm at him and forced him into a truck. In *Washington*, the victim had an unobstructed view of the weapon. *Id.* ¶ 35. Since no firearm was recovered, the defendant argued that it was unknown whether the weapon observed was "real or a toy." *Id.* ¶ 36. The court determined that, "given [the victim's] unequivocal testimony and the circumstances under which he was able to view the gun, the jury could have reasonably inferred that defendant possessed a real gun." *Id.*

¶ 81    In *People v. McLaurin*, 2020 IL 124563, ¶ 29, the supreme court reiterated that a rational trier of fact could infer that the defendant possessed a "real" firearm solely from the testimony of a single eyewitness.

¶ 82    In *McLaurin*, police sergeant Nicheloe Fraction observed the defendant leave a building holding a silver handgun. *Id.* ¶ 4. She was 50 feet away and had an unobstructed view of the defendant. *Id.* He entered a van, and the vehicle drove away. *Id.* After police stopped the vehicle, Fraction identified the defendant as the person she saw carrying the firearm into the van. *Id.* ¶¶ 4-5. Police recovered a firearm under the stopped vehicle, and Fraction testified that the recovered weapon was " 'the same color [and] size of the handgun I saw the gentleman enter the van with.' " *Id.* ¶¶ 5, 8. She stated that she was familiar with firearms, having worked with them during her 12 years as a police officer. *Id.* ¶ 5. The firearm was not presented as evidence at trial. *Id.* ¶ 8.

¶ 83    The supreme court held that eyewitness testimony alone can prove a defendant's criminal possession of a firearm. *Id.* ¶¶ 29-30. It pointed to Fraction's testimony that she saw the defendant " 'in plain daylight' " walk near her vehicle carrying a firearm and noted that she was familiar with firearms as a police officer. *Id.* ¶ 36. Although the evidence was not overwhelming where no firearm was produced at trial, based on the court's standard of review, the testimony "was not so unreasonable, improbable, or unsatisfactory that no rational trier of fact could have found beyond a reasonable doubt that defendant possessed a firearm as defined by the FOID Act." *Id.* ¶ 38.

¶ 84    Accordingly, the testimony of Mints and Salter, if positive and credible, can sufficiently establish that defendant possessed a firearm when he robbed the Family Dollar store. We disagree with defendant that, in order to be sufficient, such testimony must also describe the weapon with specificity or the witness must have a familiarity with firearms. See *People v. Joseph*, 2021 IL App (1st) 170741, ¶ 63 (finding that the State need not present direct evidence of the firearm's

characteristics and the testimony of a single witness with no experience or knowledge of firearms is sufficient to convict). While these details may give more weight or credibility to the testimony, such issues are for the jury to resolve. We are tasked only with determining whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found beyond a reasonable doubt that defendant possessed a firearm when he robbed the Family Dollar store. *McLaurin*, 2020 IL 124563, ¶ 32.

¶ 85    Here, the testimony of Mints and Salter supports the jury's determination that defendant possessed a firearm when he committed the robbery. Both testified that they saw defendant holding a firearm in his left hand, under his jacket. Mints "could see a gun, like a barrel." Salter testified that defendant "had a gun pointed to us." She was within arm's length of defendant, and nothing obstructed her view. Salter described the weapon as "an old school gun, like a cowboy gun." Nothing interfered with their ability to observe defendant, and their testimony regarding the firearm was unimpeached.

¶ 86    Defendant also threatened Mints with the firearm, telling her that, if she wanted to see her children, she needed to give him the money. Defendant then unzipped his coat, and Mints saw the firearm in his left hand. She had difficulty opening the register because she was nervous. Salter observed that Mints' hands were "shaking." When Salter tried to open another register, her hand was also shaking. "A defendant's threat to shoot a victim is circumstantial evidence that he was armed with a firearm." *Joseph*, 2021 IL App (1st) 170741, ¶ 71.

¶ 87    Defendant posits that the firearm Mints and Salter observed was an antique firearm specifically excluded from the statutory definition. This argument, however, was not raised before the trial court. Generally, issues not raised in the trial court are considered forfeited on appeal. *People v. Hicks*, 101 Ill. 2d 366, 371 (1984). Since the State did not argue forfeiture on appeal and

because the issue may involve an essential element the prosecution must prove, we will address defendant's contention. See *id.*

¶ 88    An "antique firearm" is excluded as a firearm under the statute because "by reason of the date of its manufacture, value, design, and other characteristics [it] is primarily a collector's item and is not likely to be used as a weapon." 430 ILCS 65/1.1 (West 2018). Defendant refers to the definition of "antique firearm" in the Chicago Municipal Code, which follows the definition in 18 U.S.C. § 921(a)(16) (2018). The United States Code defines "antique firearm" as "any firearm *** manufactured in or before 1898" and any replica of such a firearm that "is not designed or redesigned for using rimfire or conventional centrefire fixed ammunition." *Id.* § 921(a)(16)(A), (B)(i). Defendant contends that Salter's description of the firearm as an "old school" or "cowboy style" weapon fits this definition; therefore, he was not carrying a firearm as defined by the FOID Act during the robbery.

¶ 89    We disagree. Other than Salter's general description of the firearm, there is no evidence that the weapon was manufactured before 1898. The firearm could have been a replica of an antique firearm, but such a weapon is excluded under the statute only if it was not designed to use certain fixed ammunition. There was no evidence at trial regarding the type of ammunition used by the firearm. Furthermore, the statute excludes antique firearms because of their value as a collector's item. 430 ILCS 65/1.1 (West 2018). It is unlikely that a person would use a valuable antique firearm to rob a Family Dollar store.

¶ 90    Although the possibility exists that the weapon observed was an excluded antique firearm, that prospect alone does not create reasonable doubt. See *Joseph*, 2021 IL App (1st) 170741, ¶ 73 (finding that the possibility the offender used a toy gun did not rise to the level of reasonable doubt). Mints and Salter credibly testified that they observed defendant with a firearm, and they

behaved as if he had one. The jury need not disregard inferences that naturally flow from the evidence or accept all possible explanations consistent with defendant's innocence and elevate them to the status of reasonable doubt. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228-29 (2009). Viewing the evidence in the light most favorable to the State, a rational trier of fact could have found beyond a reasonable doubt that defendant possessed a firearm as defined by the FOID Act.

¶ 91                                    B. *Other-Crimes Evidence*

¶ 92     Defendant contends that the trial court erred in admitting evidence of four armed robberies he committed between October 7 and November 21, 2007. We review the trial court's ruling on the admissibility of evidence for abuse of discretion, which occurs when the ruling is arbitrary or fanciful or where no reasonable person would take the trial court's view. *People v. Donoho*, 204 Ill. 2d 159, 182 (2003).

¶ 93     Under common law, evidence is admissible if it tends to make the existence of any fact consequential to the case's determination more or less probable than it would be without the evidence. *People v. Pikes*, 2013 IL 115171, ¶ 21 (citing Ill. R. Evid. 401, 402 (eff. Jan. 1, 2011)). Other-crimes evidence, however, is generally inadmissible because it has "too much" probative value. *People v. Manning*, 182 Ill. 2d 193, 213 (1998). Such evidence may cause the jury to convict a defendant simply for being "a bad person deserving punishment." *Donoho*, 204 Ill. 2d at 170. While other-crimes evidence is not admissible to show a defendant's propensity to commit a crime, it may be admitted for other purposes, such as "to prove intent, *modus operandi*, identity, motive, absence of mistake, and any material fact other than propensity that is relevant to the case." *Id.*; see also Ill. R. Evid. 404(b) (eff. Jan. 1, 2011)).

¶ 94     The trial court allowed the State to admit evidence of defendant's prior crimes to prove identity and *modus operandi*. Prior crimes admitted under the *modus operandi* exception are

viewed as circumstantial evidence of identity because crimes committed in a similar manner suggest a common offender "and strengthen[ ] the identification of the defendant." *People v. Shief*, 312 Ill. App. 3d 673, 681 (2000). When evidence is offered to show *modus operandi*, "there must be a high degree of identity between the facts of the crime charged and the other offense in which the defendant was involved." *People v. Illgen*, 145 Ill. 2d 353, 372-73 (1991). This similarity is necessary because an offender's identity under a theory of *modus operandi* is based on "a distinctive pattern of criminal activity [that] earmarks the crimes as the work of a particular individual or group." *People v. Robinson*, 167 Ill. 2d 53, 65 (1995). Even if no particular distinctive feature is present, "a sufficient number of common features can form a distinctive combination sufficient to establish the existence of a *modus operandi*." *People v. Hansen*, 313 Ill. App. 3d 491, 506 (2000).

¶ 95    Defendant argues that the trial court should not have admitted the other-crimes evidence because his prior offenses were not sufficiently distinctive. He was convicted of armed robbery of a Family Dollar store, and these types of armed robberies commonly occur. He cites *People v. Gordon*, 2016 IL App (1st) 134004, and *People v. Jackson*, 2022 IL App (3d) 190455-U,[1] as examples of cases where the defendant robbed a dollar store with a firearm. Defendant refers to a hypothetical discussed in *People v. Lenley*, 345 Ill. App. 3d 399 (2003), as an illustration of a distinctive feature: a robber demanding Fritos instead of cash at a gas station. Defendant contends that demanding money from a dollar store clerk while holding a firearm is "simply not distinctive" and that the trial court erred in admitting such evidence.

---

[1]We note that unpublished orders under Illinois Supreme Court Rule 23(e) (eff. Jan. 1, 2021) are nonprecedential but may be cited as persuasive authority. Here, defendant cites the case to show that dollar store armed robberies are common, and not for legal precedent.

¶ 96    We disagree. While an armed robbery of a Family Dollar store in a high crime area may not be distinctive, the case at bar and the armed robberies admitted as evidence share "a distinct pattern of criminality" sufficient to establish *modus operandi*. *People v. Littleton*, 2014 IL App (1st) 121950, ¶ 43. Taken together, the evidence showed that defendant typically entered a Family Dollar store on the south side of Chicago in the evening or near closing time, pretended to look for or purchase items, revealed a firearm to the clerk, demanded money, and, if the clerk did not quickly comply, became impatient and threatened harm. In each case, defendant was identified by the clerk as the offender. Although some dissimilarities exist with each robbery, the test is not one of exact or rigorous identity. *People v. Jones*, 328 Ill. App. 3d 233, 239 (2002). Rather, differences are expected between independent crimes. *Id.*

¶ 97    We also recognize that the prior robberies occurred in 2007, approximately nine years before the present offense. Defendant, however, was incarcerated for most of that period and was paroled in June 2015, only 9 or 10 months before the 2016 armed robbery at issue. Our supreme court has cautioned that "admissibility of other-crimes evidence should not, and indeed cannot, be controlled solely by the number of years that have elapsed between the prior offense and the crime charged." *Illgen*, 145 Ill. 2d at 370. In fact, this court has allowed past crimes that occurred more than 10 years before the charged offense to establish *modus operandi*. See *Littleton*, 2014 IL App (1st) 121950, ¶ 34 (upholding the trial court's admission of testimony regarding robberies that occurred in 1994 and 1997 to show *modus operandi* in a 2008 case).

¶ 98    The trial court found the robberies sufficiently similar and distinctive to identify defendant as the "Family Dollar armed robber" and allowed the State to present the evidence to show *modus operandi*. This determination was not arbitrary, fanciful, or unreasonable.

¶ 99    Moreover, the admission of the other-crimes evidence did not unduly prejudice defendant.

The trial court carefully considered the evidence and its potential prejudicial effect. Although the State sought to admit 13 prior offenses, the court allowed only 4. Also, the evidence of defendant's prior armed robberies was not the focal point of trial. Of the State's 10 witnesses, 3 testified about prior offenses. The assistant state's attorney referred to the other-crimes evidence in opening statement and closing argument, but the bulk of her arguments focused on evidence pertaining to the 2016 offense. Her references to the other-crimes evidence consisted of one paragraph of a four-page transcript of the opening statement, and approximately one page of a seven-page transcript of the closing argument. Furthermore, before each other-crimes witness testified, the trial court instructed the jury to consider the testimony only for identity, intent, motive and *modus operandi*. Where the bulk of the State's case did not consist of other-crimes testimony and the trial court admonished the jury to consider the evidence for limited purposes, "any prejudice from it would not outweigh its probative value." *People v. Novak*, 242 Ill. App. 3d 836, 860 (1993).

¶ 100                    C. *Juror Bias*

¶ 101   Defendant argues that he was denied a fair trial when the trial court refused to excuse a juror who had worked with a State witness. It is well established that a defendant has a constitutional right to trial by an impartial jury. *People v. Peeples*, 155 Ill. 2d 422, 458 (1993). Accordingly, "the discovery of juror bias might compel the reversal of a judgment and a remand for a new trial." *Ittersagen v. Advocate Health & Hospitals Corp.*, 2021 IL 126507, ¶ 40. Whether a juror is prejudiced so that he or she could not be fair and impartial is a determination that rests within the trial court's sound discretion. *People v. Runge*, 234 Ill. 2d 68, 104 (2009).

¶ 102   After Lile testified, juror Linda Slansky alerted the trial court that she had worked with Lile at HRD ManorCare. She stated, however, that her previous employment relationship with Lile

would not affect her ability to be fair and impartial. The court allowed the parties to ask Slansky questions, and this exchange followed:

"DEFENDANT: Yes, I would ask her to be removed because she knows one of the witnesses. But not just that but the State's attorney just got through smiling at her and, you know, I'm just saying. I ain't saying she can't be—I just, I don't agree, Your Honor. I object, I don't agree.

THE COURT: All right. Did your contact with Ms. Lile go beyond the fact that you shared employment some months ago[?]

JUROR SLANSKY: Yes—oh, from beyond it, no.

THE COURT: No social contact?

JUROR SLANSKY: No, no. I'm sorry I had her on Facebook for a little while and I deleted her.

THE COURT: Have you ever been to her house?

JUROR SLANSKY: No.

THE COURT: She to your house?

JUROR SLANSKY: No, we're not like that.

THE COURT: So you're not social friends?

JUROR SLANSKY: No.

THE COURT: So the Facebook was because you were employees at the same location?

JUROR SLANSKY: Correct.

THE COURT: When's the last time you saw her before today?

JUROR SLANSKY: Back in November.

THE COURT: November?

JUROR SLANSKY: Yes.

THE COURT: Do you still work with her?

JUROR SLANSKY: No, I'm unemployed.

THE COURT: You're unemployed now, all right. But she still works at that location?

JUROR SLANSKY: Yes."

The trial court was satisfied that the juror could be fair and impartial. As for defendant's remark that he observed the assistant state's attorney smiling at Slansky, the court "did not observe that to be the case" and, in any event, did not believe "the act of smiling at an individual somehow indicates that that individual would be less than fair and impartial." The court allowed Slansky to remain on the jury.

¶ 103   The record shows that the trial court thoroughly questioned Slansky. She stated that she only worked briefly with Lile and did not socialize with her. Slansky was no longer employed by the same company and had not seen Lile from November until the trial in May. Slansky confirmed that she could be fair and impartial. The trial court was in the best position to observe her demeanor and critique her remarks. *People v. Buss*, 187 Ill. 2d 144, 187 (1999). We find that the court did not abuse its discretion when it refused to excuse Slansky from the jury.

¶ 104   Defendant disagrees, citing two cases as support. In *People v. Brisbon*, 89 Ill. App. 3d 513, 515-16 (1980), the trial court dismissed a juror who was a friend and neighbor of one of the victims. In *People v. Jones*, 105 Ill. 2d 342, 350-51 (1985), a juror brought a copy of a joke that contained "denigrating, racist comments." The supreme court held that prejudice will be presumed "[w]here black racist material is found in the jury room during the trial of an accused black man, and the

material has admittedly been read by three members of an all-white jury." *Id.* at 352. Here, Slansky was not a neighbor or friend of Lile, and there is absolutely no evidence she displayed racist views to the jury. *Brisbon* and *Jones* are distinguishable. Therefore, defendant has not established his claim of a biased juror.

¶ 105                                   D. *Standby Counsel*

¶ 106   Defendant argues that the trial court erred in denying his request for standby counsel. Although the trial court may appoint standby counsel to assist a *pro se* defendant, "the right of self-representation does not carry with it a corresponding right to the assistance of a legal adviser." *People v. Gibson*, 136 Ill. 2d 362, 383 (1990). A defendant who chooses to represent him or herself "must be prepared to do just that." *Id.*

¶ 107   Under certain circumstances, however, a trial court's refusal to appoint counsel can be an abuse of discretion. When deciding whether to appoint standby counsel, the trial court considers "the nature and gravity of the charge, the expected factual and legal complexity of the proceedings, and the abilities and experience of the defendant." *Id.* at 380.

¶ 108   Citing *Gibson*, defendant argues that the trial court below abused its discretion when it "flatly denied" his request for standby counsel without giving a reason. This court has consistently maintained, however, that the trial court need not articulate its reasoning on each *Gibson* factor when deciding whether to appoint standby counsel. See *People v. Ware*, 407 Ill. App. 3d 315, 351 (2011) (finding no abuse of discretion in denying the defendant's request for standby counsel where the trial court failed to reference anything specific in the defendant's case regarding the *Gibson* factors); see also *People v. Phillips*, 392 Ill. App. 3d 243, 265 (2009) (noting that, "[a]lthough the trial court in the case at bar did not recite these factors on the record, a trial court

is presumed to know the law and apply it properly"); *People v. Ellison*, 2013 IL App (1st) 101261, ¶ 47 (same, citing *Ware* and *Phillips*).

¶ 109   Based on our review of the record, we find no abuse of discretion here. While defendant faced a serious charge, unlike *Gibson*, this is not a capital case. This court has found no abuse of discretion in denying standby counsel where the defendant was convicted of first degree murder and sentenced to 40 years' imprisonment. See *People v. Pratt*, 391 Ill. App. 3d 45, 58 (2009). Also, the facts and law in defendant's case were relatively simple even though fingerprint evidence was involved. See *People v. Mazar*, 333 Ill. App. 3d 244, 251 (2002) (finding that "the balance of the issues at trial were relatively simple" even with the admission of fingerprint, footprint, and glass identification testimony), *abrogated on other grounds by People v. Breedlove*, 213 Ill. 2d 509, 515-16 (2004).

¶ 110   Regarding defendant's abilities and experience, he had a history of armed robberies with 13 prior convictions. Of relevance here, he "had experience with the exact type of charge[ ] he was on trial for in the instant case." *Id.* Although defendant contends that he lacked courtroom experience because he pled guilty in those cases, he demonstrated an ability to conduct himself during the proceedings. See *Ellison*, 2013 IL App (1st) 101261, ¶ 49. Pretrial, defendant filed written motions that resulted in the trial court holding a hearing on the missing surveillance video. Defendant also argued that the admission of other-crimes evidence would unduly prejudice him. During trial, defendant cross-examined witnesses regarding their identification of him as the offender. He questioned the credibility of eyewitness testimony where Mints described the robber as five feet, eight inches tall, and the testimony was inconsistent on whether the offender held the firearm outside or inside his jacket. Defendant also presented an opening statement and a closing argument based on the evidence presented at trial.

¶ 111    Defendant contends that he was not effective in impeaching the witnesses and had difficulty challenging the State's evidence. Instead, he spent "lengthy periods" on the surveillance video and cookie box, items the State did not present at trial. According to defendant, his poor trial performance indicates that he was prejudiced by the court's decision to deny him standby counsel.

¶ 112    When reviewing the trial court's decision to deny standby counsel, we need not inquire, "with the benefit of hindsight, whether defendant pursued a strategy that a trained lawyer might not pursue." *Id.* ¶ 51. Here, defendant exercised his constitutional right to represent himself and control the case he wanted to present to the jury. In doing so, he rejected three public defenders and one hired counsel. From June 2017, when defendant first expressed dissatisfaction with his attorney, to March 2018, when the trial court granted defendant's motion to proceed *pro se* for the final time, the court repeatedly warned him of the risks of self-representation. The court also admonished defendant twice that it would not appoint standby counsel. Defendant, however, wanted to file and argue his "own motions." When he dismissed his last attorney, defendant told the court, "I'll represent myself and file my own motions and argue my own motions. Because if he saying he is not going to file my motions and I know we have motions to be filed, that's—I can't accept that." The court expressed frustration with defendant's continued rejection of counsel. In the court's view, defendant "just want[ed] people to do what [he thought] *** they should do."

¶ 113    Defendant expressed a strong desire to proceed *pro se*, which the trial court honored despite its misgivings. Examining the *Gibson* factors and the circumstances of the case, we find that the trial court's decision to deny defendant's request for standby counsel was not arbitrary or fanciful or one where no reasonable person would take the trial court's view.

¶ 114                                    E. *Trial Court Bias*

¶ 115   Defendant contends that a new trial is warranted where the conduct of the trial court revealed a severe bias. The trial court has wide discretion to control the course of trial, including the "discretion to raise objections and to question witnesses." *People v. Wiggins*, 2015 IL App (1st) 133033, ¶ 46. The court, however, must conduct itself " 'in a fair and impartial manner, without showing bias or prejudice against either party.' " *Id.* (quoting *People v. Marino*, 414 Ill. 445, 450 (1953)). If the trial court acted improperly, a new trial is warranted only if the defendant was prejudiced by the court's misconduct. *People v. Moon*, 2019 IL App (1st) 161573, ¶ 40.

¶ 116   Defendant first contends that the trial court improperly served as an advocate for the State when it *sua sponte* objected to defendant's cross-examination of witnesses. Defendant compares his case to *Wiggins* and argues that the trial court here failed to act as a neutral arbiter.

¶ 117   In *Wiggins*, the trial judge made two *sua sponte* objections during defense counsel's cross-examination of witnesses. *Wiggins*, 2015 IL App (1st) 133033, ¶¶ 48-49. The first occurred after the prosecution objected to a question as " '[i]mpeaching.' " *Id.* ¶ 48. Instead of ruling on the objection, the trial judge objected to the question as beyond the scope of redirect examination. *Id.* This court noted that "[s]cope objections prevent the jury from hearing relevant, admissible testimony *** solely on the basis of the attorney's failure to ask the question at the correct time." *Id.* Therefore, the trial judge's *sua sponte* scope objection "helped the prosecutor find a way to prevent the jury from hearing relevant, admissible evidence defense counsel sought to elicit." *Id.*

¶ 118   The judge's second *sua sponte* objection arose when defense counsel cross-examined an assistant state's attorney and attempted to establish that the police had conducted an inadequate investigation into the shooting. *Id.* ¶¶ 20, 49. The trial judge objected to the questioning because it concerned police activity and the witness was not a police officer. *Id.* ¶ 20. The trial judge then sustained his own objection. *Id.* This court found that the judge should have questioned the witness

about her knowledge of proper investigatory procedures before sustaining his objection, where "such an effort could have shown that defense counsel's questions would elicit admissible testimony." *Id.* ¶ 49. By sustaining its own objection without further inquiry, the trial judge "precluded the jury from hearing potentially admissible evidence." *Id.*

¶ 119 Here, defendant argues that the trial court, like the judge in *Wiggins*, made several *sua sponte* objections that precluded him from eliciting useful evidence. One objection occurred when defendant attempted to impeach Salter's testimony that she did not attend the grand jury proceedings:

"DEFENDANT: *** [C]ould you please tell the jury who made this 15 page statement to the Grand Jury on November 3, 2016?

WITNESS: I'm not sure. It wasn't me. I wasn't there.

THE COURT: A little less drama, okay. A little less drama, Mr. Moore, you don't need to be dropping papers.

DEFENDANT: I'm sorry, Your Honor. I'm sorry, Your Honor.

THE COURT: All right.

DEFENDANT: Are you telling—

THE COURT: Just ask her a question, don't ask her questions about are you telling. Ask her simple questions.

DEFENDANT: I'm sorry, I'm sorry.

THE COURT: You don't get any advantage because you're representing yourself. You have to ask questions—

DEFENDANT: I'm sorry.

THE COURT:—that are permissible.

DEFENDANT: All right.

DEFENDANT: You were questioned by the State's attorney on November 3, 2016, at the Grand Jury with Darlene Salter and Detective Marshall?

WITNESS: (No audible response.)

DEFENDANT: You did not go there?

WITNESS: No.

DEFENDANT: So can you please tell us who put this in discovery—

THE COURT: All right. Mr. Moore, I can tell that is an objectionable question from way over here. She has nothing to do with the discovery.

DEFENDANT: All right, Your Honor."

It is evident from this exchange that, far from acting as an advocate for the State, the trial court was doing its best to guide defendant so he could elicit the testimony through permissible means.

¶ 120 The second objection occurred during defendant's cross-examination of Mints:

"DEFENDANT: [D]id you know Detective Jackson looked at the surveillance video the night of the robbery?

WITNESS: I'm not sure.

ASSISTANT STATE'S ATTORNEY: Objection.

THE COURT: The answer may stand.

DEFENDANT: You're not sure. Do you know did he make a statement—

THE COURT: That's going into an obviously objectionable question about what she knows.

DEFENDANT: All right, Your Honor."

Defendant argues that the court's objection precluded him from "reveal[ing] the sloppy police work that prevented the video's recovery." However, defendant later elicited the following testimony during his cross-examination of Detective Jackson:

"DEFENDANT: Can you tell us, why wouldn't you try to get a copy of the store surveillance video?

WITNESS: I did attempt to get the copy of the video. And the security firm, whoever is handling that, never gave me the video.

DEFENDANT: Did you go out to Tinley Park to try to contact the person you said you—you got into—I mean, that you got in contact with? To the office in Tinley Park, did you ever go out there to try to retrieve it?

WITNESS: No, sir.

DEFENDANT: So you've been an officer for 29 years; correct?

WITNESS: Yes, sir.

DEFENDANT: And this is an important case dealing with an armed robbery; correct?

WITNESS: Yes, sir."

Defendant used this evidence in his closing argument to tell the jury, "Detective Jackson came in this courtroom. He's been a Police Officer for 29 Years. And you're telling me, that you cannot go get a video." Defendant was not prejudiced where he was able to elicit the same testimony to which the trial court *sua sponte* objected. *Moon*, 2019 IL App (1st) 161573, ¶ 41.

¶ 121    The third objection occurred when defendant cross-examined Salter regarding two phone calls he made to her. The trial court interrupted, "Let me stop you. Let me just stop you. This is— I don't know if this is new information to the State or not. Is there an objection? I mean I'm not

suggesting there should be one, but." A review of the exchange in full, as set forth in our facts, shows that the trial court was primarily concerned with how this line of questioning would impact defendant. The court asked defendant if he wanted Salter to answer and he responded, "Yes, yes." Salter then testified that defendant did not threaten her, but she believed he was "tampering with the evidence" and that he should not "reach out to a person [he] robbed over the telephone." The court suggested that defendant "move on to a different line of questioning."

¶ 122   Unlike the judge in *Wiggins*, the trial court here did not assist the State in making its case or preclude defendant from eliciting potentially admissible evidence. In fact, these excerpts show that the court was attempting to assist a *pro se* defendant. We find no support in this evidence that the trial court acted as an advocate for the State.

¶ 123   Defendant also argues that the trial court's comments during trial reflected a hostility towards the defense and improperly communicated to the jury its negative opinion of defendant and his case. Furthermore, the court made "sarcastic, belittling, and offensive" remarks outside of the jury's presence that revealed a severe bias against him. Defendant contends he was denied a fair trial as a result.

¶ 124   A defendant has the right to a fair and impartial trial by jury, "free from influence or intimation by the trial court." *People v. Sprinkle*, 27 Ill. 2d 398, 402 (1963). The trial judge is presumed to be impartial, and the party asserting bias or prejudice must overcome this presumption. *People v. Faria*, 402 Ill. App. 3d 475, 482 (2010). The fact that a judge displayed irritation or displeasure with the defense "is not necessarily evidence of judicial bias against defendant." *People v. Jackson*, 205 Ill. 2d 247, 277 (2001). Furthermore, "[a]llegations of judicial bias must be viewed in context and should be evaluated in terms of the trial judge's specific reaction to the events taking place." *Id.*

¶ 125   Here, defendant points to comments the trial court made during trial that defendant was "go[ing] on and on and on," that he was talking about issues that "aren't helping," and that the court would not "wait all day" for defendant to ask witnesses "objectionable questions." The court also suggested that defendant should "move on" to something "relevant so we don't waste this jury's time and the witness's time." Defendant argues that the court's remarks belittled defendant and cast a negative light on him and his defense.

¶ 126   Viewing the comments in context, as set forth in the facts, it is clear that the court was impatient with defendant's continued attempts to elicit inadmissible testimony from witnesses. As defendant acknowledges in his brief, the court made many of the challenged comments when he questioned witnesses about the surveillance video, which was not in evidence. When defendant attempted to question Mints about a police report, the trial court sustained the State's objection that the witness "did not write any reports." The court then remarked, "[i]f you don't have any more questions, I'm going to excuse the witness. We're not [*sic*] going to move on. I'm not going to wait all day for you to ask objectionable questions." This showing of impatience, in itself, does not evidence bias against defendant or his case. *Faria*, 402 Ill. App. 3d at 482.

¶ 127   Furthermore, acting as his own attorney, defendant was required to follow evidentiary rules. Given defendant's repetitive questioning and numerous attempts to elicit inadmissible testimony regarding the video, the trial court was "entitled to limit the cross-examination to control the trial." *People v. Garrett*, 276 Ill. App. 3d 702, 712 (1995). As such, the remarks did not indicate bias or prejudice against defendant or his case. *Id.* at 713.

¶ 128   *People v. Eckert*, 194 Ill. App. 3d 667 (1990), and *People v. Stokes*, 293 Ill. App. 3d 643 (1997), cases cited by defendant as support, are inapposite. Neither case involved a *pro se* defendant, and defense counsel was not attempting to elicit inadmissible evidence when the court

made the challenged comments. Moreover, both *Eckert* and *Stokes* noted that, when viewed in isolation, the court's remarks were insufficient to create prejudice or bias. Viewed in the entirety, however, the court's comments and other misconduct deprived the defendant of a fair trial. *Eckert*, 194 Ill. App. 3d at 675; *Stokes*, 293 Ill. App. 3d at 649. While the trial court here made remarks that were uncomplimentary to defendant, in the context of the entire proceeding they did not rise to the level of prejudice or bias.

¶ 129   Defendant disagrees, arguing that remarks made outside of the jury's presence reveal the court's severe bias against him. He contends that the comments, fully set forth in the facts, show the court mocking defendant's criminal history and lack of legal prowess and criticizing defendant's decision to represent himself. Defendant alleges that one comment was especially egregious because it referenced a label " 'used to demean African-American men *** throughout American history,' " quoting *Tademy v. Union Pacific Corp.*, 614 F.3d 1132, 1142 (10th Cir. 2008). The trial court asked defendant a question, which he did not answer. The court remarked, "Uh? Boy, that's not an answer. That's the only answer that you're really good at is uh."

¶ 130   The State contends that the trial court used the word "boy" as " 'typically used in everyday English,' " quoting *Tademy*. See *id.* Specifically, the State argues that the court used the word to express "disbelief and frustration" with defendant for not answering a question. There is arguably some support for this in the record, as shown in an exchange at the June 29, 2017, hearing. Defendant, who was represented by counsel at the time, became frustrated when the court refused his request to file his own motions. Defendant continued to argue with the court, resulting in this exchange:

> "THE COURT: You don't talk when I'm talking. Take him out of here.
>
> DEFENDANT: You b***. I don't care.

THE COURT: Oh boy, you're a tough guy. You're a tough guy, aren't you, Mr. Moore?

DEFENDANT: You can't tell me I can't file nothing."

¶ 131 Defendant acknowledges that, during the proceedings, he "became frustrated, used profanity, yelled, and even punched a window." While the trial court understandably found it challenging to conduct proceedings with defendant representing himself, we caution that judges should aspire to be patient, dignified, and courteous to litigants and those they encounter in the courtroom. See *People v. Muoi Phuong*, 287 Ill. App. 3d 988, 994-95 (1997). The trial court used language that some (definitely defendant) can take as racist and offensive. Viewing the comments in the context of the entire proceedings, we do not believe the court intended this meaning. However, we emphasize that judges should refrain from using language that can be easily misinterpreted.

¶ 132 That said, the trial court's comment, made outside the jury's presence, did not constitute a material factor in defendant's conviction. From our review of the entire proceedings, which spanned more than four years from pretrial to posttrial, the trial court often displayed patience when defendant expressed frustration and, as another judge found when he denied defendant's posttrial motion for substitution of judge, "bent over backwards, actually, to give the defendant a fair trial." Viewed within the totality of the circumstances, the trial court's comments and conduct did not indicate a bias or prejudice against defendant that denied him a fair trial.

¶ 133                            F. *Excessive Sentence*

¶ 134 Defendant's final contention is that his 45-year sentence is excessive. He argues that the trial court imposed a "trial tax" as punishment for exercising his right to go to trial rather than accept the State's plea offer.

¶ 135    The mere fact that the trial court imposed a greater sentence than was offered during plea negotiations "does not, in and of itself, support an inference that the greater sentence was imposed as a punishment for demanding trial." (Internal quotation marks omitted.) *People v. Jones-Beard*, 2019 IL App (1st) 162005, ¶ 26. Instead, the record must clearly show that the harsher sentence resulted from defendant's trial demand. *People v. Ward*, 113 Ill. 2d 516, 526 (1986). Explicit remarks made by the court concerning the reason for the harsher sentence, or the fact that the sentence is "outrageously higher" than the one offered by the State, can be clear evidence of a trial tax. *Jones-Beard*, 2019 IL App (1st) 162005, ¶ 26. In making this determination, we consider the entire record rather than focus on a few statements by the trial court. *Ward*, 113 Ill. 2d at 526-27.

¶ 136    Defendant argues that the trial court punished him for going to trial because his 45-year sentence was "outrageously higher" than the 15-year sentence offered in plea negotiations. We disagree that a sentence three times greater than the State's offer, on its own, establishes a trial tax. See *People v. Carroll*, 260 Ill. App. 3d 319, 349 (1992) (finding that a sentence 2½ times the sentence offered in the plea deal was not outrageously excessive).

¶ 137    Furthermore, defendant faced a greater sentence going to trial because the offer he rejected would have also reduced his charge to aggravated robbery. The maximum sentence for aggravated robbery, a Class 1 offense, is 15 years' imprisonment. See 730 ILCS 5/5-4.5-30(a) (West 2018). Defendant, however, rejected the State's offer and chose a jury trial on the armed robbery charge, a Class X felony. That offense has a sentencing range of 21-45 years if committed with a firearm. See 720 ILCS 5/18-2(a)(2) (West 2018); 730 ILCS 5/5-4.5-25(a) (West 2018). Defendant was offered the maximum sentence for aggravated robbery but went to trial and received the maximum sentence for armed robbery. His sentence varied from the plea offer because he was convicted of a Class X felony after trial.

¶ 138   We also find no evidence in the record that the trial court intended to impose the 45-year sentence as a trial tax. Although the court believed it was a mistake for defendant to represent himself at trial, there is no indication the court thought he should be punished for going to trial. See *Carroll*, 260 Ill. App. 3d at 349 (a clear showing is made when the trial court has explicitly stated that it was imposing the greater sentence because defendant exercised his right to trial).

¶ 139   Nor do we find that defendant's sentence was excessive. The trial court imposed the maximum sentence after considering the mitigating circumstances as well as the aggravating factors. The court stated that it could not ignore defendant's 13 prior armed robbery convictions. However, it declined to apply extended-term sentencing because defendant did not fire the weapon and no injuries occurred. Where defendant's sentence falls within the statutory range and the trial court considers the mitigating and aggravating factors, it is not excessive or otherwise improper. See *People v. Knox*, 2014 IL App (1st) 120349, ¶ 47.

¶ 140                                    III. CONCLUSION

¶ 141   For the foregoing reasons, we affirm the judgment of the trial court.

¶ 142   Affirmed.

***People v. Robert Moore*, 2023 IL App (1st) 211421**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 16-CR-1674701; the Hon. James Michael Obbish, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Adrienne E. Sloan, of State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Enrique Abraham, Joseph Alexander, Hareena Meghani-Wakely, Ashlee Cuza, Assistant State's Attorneys, of counsel), for the People. |