2025 IL App (1st) 231346-U

No. 1-23-1346

Order filed December 19, 2025

Fifth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 18 CR 14637 |
| | ) | |
| STEVEN CALDERON, | ) | Honorable |
| | ) | William G. Gamboney, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE ODEN JOHNSON delivered the judgment of the court.
Presiding Justice Mitchell and Justice Tailor concurred in the judgment.

**ORDER**

¶ 1   *Held*: We affirm defendant's conviction for first-degree murder while armed with a firearm over his contention that his 42-year sentence amounted to punishment against him for exercising his right to trial, it is inappropriately disparate compared to the 30-year sentences of his equally culpable and similarly situated codefendants, and that it is excessive. The mittimus is corrected to reflect defendant's conviction for one count of first-degree murder.

¶ 2   Following a jury trial, defendant Steven Calderon was found guilty of two counts of first-degree murder while armed with a firearm. The trial court sentenced defendant to 42 years'

imprisonment, which included a 15-year firearm enhancement. On appeal, defendant challenges his sentence, contending that the court considered his decision to proceed to trial as a factor in aggravation, his sentence is inappropriately disparate compared to the 30-year sentences of his equally culpable and similarly situated codefendants, and it is excessive because the minimum 35-year term would balance the need for retribution while providing him the possibility of release at an age where he would be unlikely to reoffend. Defendant also requests that in accordance with the "one-act, one-crime" rule we correct his mittimus to reflect a single conviction for first-degree murder. We affirm and correct the mittimus.

¶ 3                                I. BACKGROUND

¶ 4     The State charged defendant and codefendants Edwin Calderon (Edwin) and Jose Gomez (Jose) with four counts of first-degree murder of Ricardo Gomez (Ricardo). As relevant, count I alleged that they, without lawful justification, intentionally or knowingly shot and killed Ricardo while armed with a firearm. 720 ILCS 5/9-1(a)(1) (West 2018). Count II alleged that they, without lawful justification, shot and killed Ricardo while armed with a firearm, knowing that such act created a strong probability of death or great bodily harm to Ricardo. 720 ILCS 5/9-1(a)(2) (West 2018). The State also charged defendant with numerous weapons offenses. The trial court granted defendant's motion to sever his trial from that of Edwin and Jose, who each pled guilty to first degree murder in exchange for a sentence of 30 years' imprisonment. The State proceeded to trial on two counts of first-degree murder (counts I & II).

¶ 5     At a 2019 bond hearing, the State informed the court that the evidence it intended to introduce at trial would demonstrate that defendant attempted to shoot and kill Ricardo but used a firearm that did not discharge. After the shooting, he fled from police by vehicle and then on foot.

¶ 6 At a 2023 pre-trial hearing, the State informed the trial court that it extended a plea offer to defendant whereby, in exchange for a guilty plea, the State would strike the firearm enhancement language in count I and recommend a sentence of 30 years' incarceration. The court advised defendant that if he elected to proceed with a jury trial, it would not be held against him but "here's what I don't want to have happen is we go through this trial, you get found guilty and you get sentenced to a high number which, in this case, could be natural life in prison without parole. It's not like 20 to 60 years, *** And then come back here and tell me, oh, I didn't know." The court stated that it was not trying to encourage defendant to take the State's offer, "but just so you're aware of what your exposure is on this case" and that "they're offering you 30 years in prison[.]" Defendant stated that he understood the court's admonishment and elected to proceed with a jury trial.

¶ 7                                            A.  Trial

¶ 8 Because defendant does not challenge the sufficiency of the evidence to sustain his conviction, we recount the trial evidence only to the extent necessary to resolve the issue raised on appeal.

¶ 9 The evidence adduced at trial showed that on September 18, 2018, at approximately 7:00 p.m., Ricardo drove a silver-colored sports utility vehicle (SUV) to a McDonald's parking lot near Ashland Avenue and 42nd Street in Chicago. Chicago police officer Sherry Wagner testified that on the date and time in question, she was on patrol with her partner Bridget Brubaker, driving southbound on Ashland in an unmarked police vehicle. Near the intersection of Ashland and 42nd, Wagner heard three to four gunshots coming from the area of a McDonald's restaurant parking lot just west of her. She looked in that direction and saw a male Hispanic, wearing a black face mask

and black and gray sweatshirt, standing approximately three feet from the driver's side window of a gray Cadillac SUV and shooting a handgun. Wagner activated the emergency lights on her police vehicle and drove into the parking lot. She exited her vehicle and saw a gold-colored Toyota sedan parked behind the gray SUV. As she got closer, the Toyota reversed out of the parking lot and drove southbound on Marshfield Avenue. Wagner and Brubaker then joined a "procession" of police vehicles and pursued the sedan, but lost sight of it. They continued to monitor the police radio transmissions and drove to an alley between Richmond Street and Francisco Avenue where Wagner saw the same man from the McDonald's parking lot being placed into custody. She identified the man from a photograph and later learned his name was Edwin.

¶ 10    Wagner testified that later that evening she learned that detectives had obtained two surveillance videos from the McDonald's and one from a "POD" camera located at 4203 South Ashland. The videos were admitted into evidence and published to the jury with Wagner narrating the events shown. The videos are included in the record on appeal and have been viewed by this court.

¶ 11    The McDonald's videos show a silver SUV entering the parking lot and parking in a designated space. About one minute later, a gold-colored sedan enters the parking lot and comes to a stop close behind the SUV. A man exits the front passenger side of the sedan and approaches the SUV. A few seconds later, the SUV reverses and crashes into the sedan. Two men enter the sedan and drive in reverse. The sedan turns around in the parking lot and exits the rear of the lot with police vehicles in pursuit.

¶ 12    Brubaker testified to substantially the same sequence of events as Wagner. Brubaker added that while they were driving southbound on Ashland, she was in the passenger seat of their

unmarked police vehicle and heard multiple gunshots coming from a McDonald's restaurant. She looked in the direction of the gunshots and saw a man running from the McDonald's parking lot. She also saw another man standing outside of a vehicle and shooting a dark colored handgun at a silver-colored SUV. The man was wearing a dark-colored sweatshirt and a mask that covered half of his face. As the officers drove into the parking lot, the man stopped shooting and entered a gold-colored sedan, which fled southbound on Marshfield. Brubaker and Wagner pursued the sedan, but lost sight of it. They ultimately proceeded to an alley near Richmond and Francisco where Brubaker saw the man from the McDonald's parking lot being placed into custody. She identified the man from a photographer and learned his name was Edwin. The State again published to the jury the two surveillance videos from the McDonald's restaurant while Brubaker narrated the events depicted therein.

¶ 13    Chicago police sergeant Leo Augle testified that on the date and time in question he was driving a marked police vehicle in the area of Ashland and 42nd and heard gunshots coming from a McDonald's restaurant nearby. Augle looked in the direction of the gunshots and saw a man firing a gun into a silver-colored SUV. Augle drove into the parking lot of the McDonald's and saw two men enter a small sedan. One man entered on the front passenger side and the other on the rear passenger side. The sedan fled on Marshfield and Augle pursued it while updating the dispatcher about the sedan's direction of travel. After about 10 minutes, the sedan stopped near the 4200 block of south Sacramento Avenue, and Augle saw three men exit the sedan and flee on foot. Augle gave chase and helped Chicago police commander Don Jerome apprehend Edwin. Augle testified that he was familiar with Edwin before the shooting and had seen him on multiple occasions.

¶ 14    Daniel Grand testified that on the date and time in question he was a Chicago police officer on routine patrol with his partner Katie Lukovich. They were in a marked police vehicle that was equipped with an on-board camera. About one mile from the McDonald's, they monitored a radio call of "shots fired," and joined the pursuit of a gold-colored sedan. Near Archer Avenue and Richmond, Grand drove through an alley in an attempt to intercept the sedan. As he did do, he heard over the radio that the offenders were "bailing" their vehicle and learned their description. He then saw Jerome chasing two men. One of the men, who was heavyset and wearing a black sweatshirt and black shorts, surrender to Jerome. Grand pursued the other man, who was a slender male Hispanic wearing a gray hooded sweatshirt and blue shorts. The man entered a garage where Grand found him hiding and no longer wearing the gray sweatshirt. Grand identified the man in court as defendant.

¶ 15    The State moved to admit and publish to the jury videos from Grand's on-board and body-worn camera. The videos were admitted into evidence and published to the jury with Grand narrating the events shown. The videos are included in the record on appeal and have been viewed by this court.

¶ 16    The on-board video, which lasts seven minutes, shows the police chase as it unfolded on residential streets and alleyways, and through numerous intersections controlled by traffic lights and stop signs. Grand's body-worn camera video shows Jerome, on foot, briefly pursuing Edwin, who surrenders. Grand continues on foot, pursuing defendant, whom he finds hiding in a garage. Defendant is then placed into custody.

¶ 17    Officer Paul Presnell testified that he was a forensic investigator and processed three separate crime scenes associated with the shooting. From the area near Marshfield, he recovered a

45-caliber handgun without a magazine, a rifle with a cartridge jammed in the cylinder, a mask, and two pairs of gloves. From in and around the silver SUV in the McDonald's parking lot, Presnell recovered four fired bullets, cartridge cases, and a live round. From a gold-colored sedan in the area of 4800 South Sacramento, he recovered an empty 45 caliber firearm, a black neoprene facemask, lighter fluid and a lighter.

¶ 18    Dr. Emily Hansen, who performed the autopsy on Ricardo, testified that he suffered six gunshot wounds, including to his head, neck, left upper arm, left side of the back, and two graze wounds to his left chest and left upper back.

¶ 19    After hearing closing arguments, the jury found defendant guilty of first-degree murder while armed with a firearm. The court ordered a pre-sentence investigation (PSI) report for defendant and thereafter held a sentencing hearing.

¶ 20                              B.  Sentencing

¶ 21    The PSI presented at the hearing reflected that defendant had three children, suffered from diabetes, had not been diagnosed with any psychological ailments, and denied drug or alcohol abuse. The report indicated that defendant "attempted to get his GED" while in the custody of Illinois Department of Corrections (IDOC). The report also reflected that defendant previously worked for his father's landscaping company and, prior to that, as a "packer" at a Chicago meat factory between 2015 and 2016.

¶ 22    The report listed defendant's prior convictions for aggravated fleeing and eluding (sentenced to 15 months' imprisonment in 2017), possession of ammunition without a valid Firearm Owner's Identification (FOID) card (sentenced to one year probation and community service in 2016), criminal trespass to land (sentenced to six months supervision in 2016),

possession of a firearm by a gang member (sentenced to five years' imprisonment in 2010). A State witness established that in 2018, while defendant was in Cook County Jail, he was found to be in possession of marijuana and subsequently charged with possession of contraband in a penal institution. The State nolle prossed the possession of contraband in a penal institution charge following the sentencing hearing.

¶ 23    The State published a victim impact statement from Ricardo's mother, who recounted that he was "an overall beautiful person" and a good father, brother, and child. She detailed how his loss had impacted his friends and family, including his son, and the grief they felt after the shooting. The pain to their family would always "be a struggle" that they would never forget. The State argued that the victim impact statement reflected that Ricardo's family was suffering after the "vicious" and "violent" murder.

¶ 24    In aggravation, the State argued that defendant and his cohorts ambushed Ricardo while wearing masks and gloves and shot him six times, killing him. The State pointed out that defendant believed he could escape the police and attempted to flee by vehicle and later on foot. The State noted that the evidence adduced at trial showed that defendant's cohorts discharged their firearms into Ricardo's vehicle and defendant attempted to discharge his firearm, but could not because it was loaded with incompatible ammunition. The State argued that multiple statutory factors weighed in favor of aggravation, including general deterrence, defendant's criminal history, and his conduct.

¶ 25    In mitigation, defense counsel argued that defendant was the youngest person involved in the murder of Ricardo. Counsel noted that one of the two codefendants was defendant's older brother and that codefendants' role in this offense was that they "actually shot and fired bullets

into the victim," were charged as such, and faced a minimum sentence of 45 years in prison. Counsel argued that "sometimes younger brothers follow their older brothers, good or bad," and pointed out there was no indication that defendant planned or orchestrated the shooting, was a "leader in any of this," or that he drove the sedan after the shooting.

¶ 26    Counsel informed the court that defendant had type one diabetes and would have a harder time dealing with incarceration because he was "not only serving time, but also serving time with a medical condition." Counsel acknowledged that defendant had "a gun case" and "criminal fleeing and eluding" in his background, but asserted that defendant had no "crime of violence" in his background. Rather, the case at bar was a departure from defendant's prior life given he had no history of violence.

¶ 27    Counsel requested that the trial court consider the sentences of Jose and Edwin and sentence defendant to a "comparable" period of incarceration. Counsel pointed out that Jose and Edwin were "alleged to have been more implicit [*sic*]" and "had more egregious involvement" in the murder and were sentenced to 30 years each, despite one of them having a prior murder conviction. Counsel acknowledged that defendant's decision to proceed to trial made it so that the minimum sentence he could receive would be 35 years' incarceration and requested that the court impose the minimum sentence. Counsel argued defendant was 30 years old and "sentencing him to something much more than 35 is basically sentencing him to a life sentence," especially given his medical condition.

¶ 28    In announcing sentence, the trial court noted that it considered the victim impact statement, the PSI, and the arguments from counsel during the sentencing hearing. The court stated that the

victim impact statement was "touching" and that it "keep[s] in mind" that defendant's actions resulted in Ricardo's murder, "irreversibly" changing his family.

¶ 29    Regarding the PSI, the court found it interesting because it reflected that, unlike some offenders, defendant "had the benefit of a loving family and support" where he was raised by both parents, and his father owned a business, and his mother was a school teacher. The court noted that defendant had been enrolled in high school from 2007 to 2008, and reported that he tried to obtain a GED in 2010 and may want to complete it in the future. The court stated that defendant has been "talking about getting his GED" for 13 years and questioned "what does that tell me about rehabilitative potential?"

¶ 30    The court continued, pointing out that it would consider that the PSI reflected defendant had three children and suffered from diabetes, had not been diagnosed with any psychological ailments, and had denied drug or alcohol abuse. The court stated that defendant, who was 25 years old at the time of the murder, had a "not minimum or insubstantial criminal background." The court did not "want to call him a seasoned veteran of the criminal justice system, but *** he's had four prior arrests," with two of those arrests resulting in his being sentenced to the IDOC. The court expressly noted that it was required to consider defendant's rehabilitative potential in considering his sentence but it "s[aw] signals" from defendant's criminal history that he has been given the opportunity to show "himself rehabilitating, but it hasn't been the case." The court explained that, although defense counsel characterized the shooting as "a departure" from defendant's prior criminal cases, a reasonable person could also conclude that it was an "upward trajectory of a life of criminality that starts out with smaller things," where two of his prior convictions involved weapons or possession of ammunition.

¶ 31     The court considered the mitigating factors set forth in section 5-5-3.1(a) of the Unified Code of Corrections (Code of Corrections) (730 ILCS 5/5-5-3.1(a) (West 2018)), and then individually recited the majority of the factors, finding they did not apply. Regarding factor 5, whether defendant's conduct was induced or facilitated by someone else, the court stated it found no evidence of that but would take counsel's "comments to heart" that defendant is Edwin's younger brother. Regarding factor 12, whether imprisonment would endanger defendant's medical condition, the court found this might apply as defendant had diabetes but pointed out prisons have medical facilities and Cook County Jail had managed his condition for five years.

¶ 32     The court acknowledged that defense counsel strongly urged it to consider the sentences of Jose and Edwin when sentencing defendant, but recounted that they "pleaded guilty in a hearing that takes about ten minutes," and it had agreed with the State's recommendation to sentence them to 30 years' incarceration. The court noted that, in federal court, if a defendant pled guilty, they received a less harsh sentence for saving the government the time and money required to try a case. But in defendant's case, he was "entitled to have his trial, he had his trial, he had a fair trial, I'm not going to add on because of that *** " but the court "got a lot more detail" during the trial regarding "the actual details, the exact steps all along the way of his involvement in this." The court stated that the sentences of Jose and Edwin were relevant but it was not bound by their pleas as "[i]t's a different situation."

¶ 33     The court referenced that, in the PSI report, defendant reported feeling "bad" about his previous behavior and that he took no pride in criminal behavior, and he "expressed some concerns about other people's problems." The court stated it had asked defendant whether he wanted to speak in allocution, but he declined. The court was "not reading in this message" that defendant

expressed some remorse for what he did or that he "apologized" to Ricardo's family like Jose and Edwin did by pleading guilty.

¶ 34    The court recounted the facts of the case, noting that it was mindful that defendant did not fire any shots, but pointed out that it was not for "any lack of effort" given that the gun jammed. The court explained that this was a "planned attack" where defendant was part of a group who had masks and gloves, and ambushed the victim.

¶ 35    The court sentenced defendant to 42 years' imprisonment, which included the mandatory 15-year statutory enhancement for using a firearm during the shooting. See 730 ILCS 5/5-4.5-20(a) (West 2018); 730 ILCS 5/5-8-1(a)(1)(d)(i) (West 2018).

¶ 36    Defendant did not object to his sentence or file a motion to reconsider his sentence.

¶ 37                                II. ANALYSIS

¶ 38                                A. Sentence

¶ 39    On appeal, defendant first challenges his 42-year sentence, arguing (1) the trial court considered his decision to proceed to trial as an aggravating factor during sentencing and imposed a "trial tax"; (2) he received an inappropriately disparate sentence compared to his equally culpable codefendants, who received 30-year sentences; and (3) it is excessive where the minimum term of 35 years' imprisonment would adequately balance the need for retribution against his rehabilitative potential.

¶ 40    In setting forth this argument, defendant acknowledges that he did not object to his sentence and that he failed to file a postsentencing motion challenging it. See *People v. Hillier*, 237 Ill. 2d 539, 544 (2010) (Generally, in a sentencing context, errors not brought to a trial court's attention via a contemporaneous objection at the sentencing hearing and a motion to reconsider sentence are

deemed forfeited). However, he requests that we review his claim under the plain error doctrine or as ineffective assistance of trial counsel based on counsel's failure to preserve the issue.

¶ 41     The plain error doctrine is a narrow and limited exception to forfeiture. *Id.* at 545. To obtain relief under this doctrine in the sentencing context, a defendant must show either that (1) the evidence at the sentencing hearing was closely balanced, or (2) the error was so egregious as to deny the defendant of a fair sentencing hearing. *Id.* To prevail on a claim of ineffective assistance of counsel, a defendant must show that (1) his counsel's performance was objectively unreasonable under prevailing professional norms and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 687-88, 694 (1984). Whether forfeiture may be avoided under either of these theories requires us first to determine if a clear error occurred. *People v. Garcia*, 2023 IL App (1st) 220524, ¶ 18.  Here, we find no error.

¶ 42     Defendant was found guilty of first-degree murder while armed with a firearm, an offense with a total sentencing range of 35 to 75 years' imprisonment. See 730 ILCS 5/5-4.5-20(a) (West 2018) (sentencing range for first-degree murder is 20 to 60 years); 730 ILCS 5/5-8-1(a)(1)(d)(i) (West 2018) (if the person committed the offense while armed with a firearm, 15 years shall be added to the term of imprisonment imposed by the court). The trial court imposed a 42-year sentence. Given that defendant's sentence is within the statutory range, we presume that it is proper and will only disturb it if he shows that it greatly varies with the spirit and purpose of the law or is manifestly disproportionate to the nature of the offense. *People v. Knox*, 2014 IL App (1st) 120349, ¶¶ 46-47. Defendant does not make that showing here.

¶ 43                                      1.  Trial Tax

¶ 44    Defendant first contends that the trial court improperly considered his decision to proceed to trial as a factor in aggravation and imposed a "trial tax" during sentencing.

¶ 45    It is within the discretion of a sentencing court to impose a longer sentence after trial than it would have imposed in exchange for a guilty plea. *People v. Peterson*, 311 Ill. App. 3d 38, 53 (1999). However, while a court may grant concessions to a defendant who pleads guilty, it may not penalize or punish a defendant for rejecting a plea offer and demanding trial. *People v. Ward*, 113 Ill. 2d 516, 526 (1986).

¶ 46    The mere fact that a defendant received a greater sentence than what was offered during plea negotiations does not by itself support an inference that the sentence was imposed as punishment for exercising the right to stand trial. *People v. Jones-Beard*, 2019 IL App (1st) 162005, ¶ 26. Rather, "it must be 'clearly evident' in the record that the harsher sentence resulted from the trial demand." *Id.* (quoting *Ward*, 113 Ill. 2d at 526). Such evidence may arise from explicit remarks by the trial court to the effect that the sentence imposed was punishment for the trial demand or where the imposed sentence is outrageously higher than the plea offer. *Jones-Beard*, 2019 IL App (1st) 162005, ¶ 26. To make this determination, our review is based on the record as a whole, rather than a few words or statements of the trial court. *Id.* (citing *Ward*, 113 Ill. 2d at 526-27).

¶ 47    In this court, defendant does not argue, nor would we find, that standing alone his 42-year sentence, a 40% increase, was "outrageously higher" than the 30 years offered by the State. See *People v. Moore*, 2023 IL App (1st) 211421, ¶ 136 (a sentence three times greater than the State's offer does not, on its own, establish a trial tax); see also *People v. Garcia*, 2023 IL App (1st) 172005, ¶77 (The sentence imposed was 64 years greater than the circuit court's pretrial

recommendation, representing a 177% increase and far exceeding the typical 15-60% plea-to-trial sentencing disparity, which could only be explained as a trial tax).

¶ 48    Instead, defendant contends that although the court expressly stated that it was not going to "add on" to his sentence because he availed himself of his right to a trial, the court's other remarks indicate it did just that. Specifically, he takes issue with the court having noted that, in federal court, if a defendant pled guilty, they received a less harsh sentence for saving the government the time and money required to try a case. Defendant also takes issue with the court noting that he had declined to speak in allocution, and that it was "not reading in this message" that he expressed some remorse for what he did or that he "apologized" to Ricardo's family like Jose and Edwin did by pleading guilty. He asserts that the only way he could make this kind of apology would be by foregoing his constitutional right to a trial. He maintains that the court's comments show that his sentence was, at least in part, imposed because he elected to proceed to trial.

¶ 49    After reviewing the record as a whole, we find that the court did not consider defendant's decision to proceed to trial as an aggravating factor and impose a "trial tax" during sentencing. Stated differently, the court's comments do not show that it penalized defendant for rejecting the State's offer and demanding trial.

¶ 50    Rather, the record shows that the complained-of remarks were made in the context of the trial court rejecting defense counsel's invitation to consider the sentences of Jose and Edwin when sentencing defendant. In noting that it was "relevant" but that it was not bound by their pleas as "[i]t's a different situation," the court essentially explained in detail why a codefendant who pleads guilty as part of a plea agreement does not provide a valid basis of comparison to a sentence after

trial. See *People v. Caballero*, 179 Ill. 2d 205, 217 (1997). Specifically, the court pointed out that Jose and Edwin had "pleaded guilty in a hearing that takes about ten minutes" and they received a less harsh sentence for saving the government the time and money required to try a case. See *id.* at 218 (a trial court may properly grant dispositional concessions to a defendant who pleads guilty where the public interest in the effective administration of criminal justice is served); see also *Alabama v. Smith*, 490 U.S. 794, 801, 802 (1989) (pleading guilty usually justifies leniency). The court also noted that by pleading guilty Jose and Edwin apologized to Ricardo's family. See *People v. Scott*, 2012 IL App (4th) 100304, ¶ 25 (a defendant who pleads guilty insures prompt and certain application of correctional measures, acknowledges his guilt, and demonstrates a willingness to assume responsibility for his conduct). Nothing in these remarks was punitive in nature.

¶ 51   To the contrary, the court expressly stated that it would not "add on" because defendant proceeded to trial, but pointed out that, as a result of the trial, it "got a lot more detail" regarding "the exact steps all along the way of his involvement in this." See *Smith*, 490 U.S. at 801 (a disparity in sentence may be justified by new information that was unknown at the time of the plea offer but that came to light in subsequent proceedings, including information about the nature and extent of the crime, the defendant's moral character, and the defendant's suitability for rehabilitation). Indeed, the most important sentencing factor is the seriousness of the offense. *People v. Harmon*, 2015 IL App (1st) 122345, ¶ 123.

¶ 52   Although defendant asserts there were no substantially new details presented at trial other than what the State was alleging before trial, the record shows otherwise. These details included surveillance footage of the shooting and officers testifying regarding the scene and details of the ensuing police chase, which was recorded by a police dash camera. The evidence established that

defendant and his companions planned the ambush of Richardo, bringing gloves, a mask and multiple weapons to the scene. It established they shot at him numerous times from close range, hitting him six times. In addition, the testimony of the officers and footage of the police chase, reflected the high speeds and narrow streets that defendant and his cohorts fled, along with the considerable foot and vehicle traffic they drove through. Police testimony and body worn camera footage also reflected that defendant did not surrender to police after his vehicle came to a stop. Instead, he hid and attempted to disguise his appearance by removing the sweatshirt he wore during the shooting. Therefore, the court had vastly more information after the trial and upon reviewing the PSI than it did at the time of the State's offer. See *Scott*, 2012 IL App (4th) 100304, ¶ 25 (a trial court's determination whether to ratify a plea agreement after negotiations between a defendant and the State differs qualitatively from its finding of an appropriate sentence following a trial and sentencing hearing).

¶ 53    Furthermore, we note that defendant faced a greater sentence by going to trial because the offer he rejected involved the State striking the firearm enhancement from the murder charge. The sentencing range for first-degree murder without the firearm enhancement is 20 to 60 years' imprisonment. 730 ILCS 5/5-4.5-20(a) (West 2018)). The State offered defendant a 30-year sentence. Defendant, however, rejected the State's offer and chose a jury trial on the murder charge which included the firearm enhancement. That offense has a sentencing range of 20 to 60 years for the murder plus a mandatory 15 years being added to the term of imprisonment imposed by the court. See 730 ILCS 5/5-8-1(a)(1)(d)(i) (West 2018). Defendant was therefore subject to a minimum term of 35 years' imprisonment and a maximum term of 75 years.

¶ 54    The court imposed a 27-year term for the murder, three years less than what Jose and Edwin received, and the mandatory 15-year firearm enhancement, for a total of 42 years in prison. Defendant's sentence varied from the plea offer not as a result of his trial demand, but because he was convicted of an offense with a higher sentencing range. See *Moore*, 2023 IL App (1st) 211421, ¶ 137 (finding no trial tax where the defendant rejected the State's offer that would have reduced his charge from armed robbery to aggravated robbery and, after proceeding to trial on the armed robbery, received a maximum sentence for that offense).

¶ 55    In reaching this conclusion, we are not persuaded by defendant's reliance on *People v. Jones*, 118 Ill. App. 2d 189, 197 (1969), where the evidence showed that the defendant and Earnest Harris participated in a burglary together, and to the same extent, to which Harris pled guilty and received a sentence of 6 to 12 years, while the defendant, who exercised his right to trial, received a 10-20 year sentence.  On appeal, the reviewing court found that, under the circumstances of the case, the disparity showed a "reasonable inference" that the defendant was penalized for exercising his constitutional right to trial, and reduced his sentence to match Harris's sentence. *Id.* at 197-98.

¶ 56    Notably, "[t]he *Jones* court cited nothing else in the record to justify this 'reasonable inference,' concluding, 'after considering the nature of the offense and the attendant facts and circumstances here [(*i.e.*, the case-specific facts)], that it is manifest from the instant record that the sentence is excessive and not justified by any reasonable view which might be taken of the record.' " *People v. Walker*, 2021 IL App (4th) 190073, ¶ 66 (quoting *Jones*, 118 Ill App. 2d at 198).  In addition, the "reasonable inference" analysis, "when cited at all," is typically "referenced within the context of either disparate sentences between codefendants or excessive sentences in general and not for the claimed 'reasonable inference' of a 'trial tax' as in this case." *Walker*, 2021

IL App (4th) 190073, ¶ 66. That said, even if we were to apply the reasonable inference analysis, our conclusion would not change given the record at bar as outlined above and the fact that defendant proceeded to trial on the murder charge with the firearm enhancement and the plea offer was premised on first-degree murder without the firearm enhancement.

¶ 57                                2.  Disparate Sentence

¶ 58     Defendant next contends that his 42-year sentence is inappropriately disparate compared to the 30-year sentences of his equally culpable and similarly situated codefendants Jose and Edwin.

¶ 59     Our supreme court has found that fundamental fairness requires that "similarly situated" codefendants, who were involved in the same crime, should not "receive grossly disparate sentences." *People v. Fern*, 189 Ill. 2d 53, 58 (1999). To prevail on a claim of disparate sentencing, a defendant must show that he and his codefendants were (1) equally culpable and (2) similarly situated with respect to their background, prior criminal history, and potential for rehabilitation. *People v. Guerrero*, 2020 IL App (1st) 172156, ¶ 53.

¶ 60     However, "[a] sentence imposed on a codefendant who pleaded guilty as part of a plea agreement does not provide a valid basis of comparison to a sentence after trial." *Caballero*, 179 Ill. 2d at 217. This is because a trial court may properly grant dispositional concessions to a defendant who pleads guilty since the public interest in the effective administration of criminal justice is served. *Id.* at 218; see also *Scott*, 2012 IL App (4th) 100304, ¶ 25 (" 'a trial court may properly grant leniency to the defendant who pleads guilty and thereby insures prompt and certain application of correctional measures, acknowledges his guilt, and demonstrates a willingness to assume responsibility for his conduct' " (quoting *People v. Foster*, 199 Ill. App. 3d 372, 393

(1990))). In addition, a trial court's determination whether to ratify a plea agreement entered through negotiations between a defendant and the State differs qualitatively from the court's finding of an appropriate sentence following a trial and sentencing hearing. *Scott*, 2012 IL App (4th) 100304, ¶ 25. Accordingly, given Jose's and Edwin's guilty pleas, we reject defendant's contention that the sentences are impermissibly disparate.

¶ 61                                     3. Excessive Sentence

¶ 62    Defendant's last challenge to his sentence is that it is excessive because the minimum 35-year term would balance the need for retribution while providing him the possibility of release at an age where he would be unlikely to reoffend.

¶ 63    The Illinois Constitution requires that, in imposing sentence, the court must balance "the seriousness of the offense" and "the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. To achieve that balance, a trial court must consider a number of factors in aggravation and mitigation. *Jones-Beard*, 2019 IL App (1st) 162005, ¶ 20 (citing *People v. Alexander*, 239 Ill. 2d 205, 213 (2010)). In doing so, the trial court has broad discretion and its sentencing decisions are entitled "great deference" because it is in a superior position to this court to consider factors such as "the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age." (Internal quotation marks omitted.) *Alexander*, 239 Ill. 2d at 212-13. We will not reverse a sentence absent an abuse of discretion. *Knox*, 2014 IL App (1st) 120349, ¶ 46.

¶ 64    Where a sentence is within the statutory guidelines prescribed for the offense, we presume it to be proper. *Id.* ¶¶ 46-47. We will only find such a sentence to be an abuse of discretion if the defendant makes an affirmative showing that the sentence is " 'greatly at variance with the spirit

and purpose of the law, or manifestly disproportionate to the nature of the offense.' " *People v. Watson*, 2021 IL App (1st) 180034, ¶ 61 (quoting *People v. Stacey*, 193 Ill. 2d 203, 210 (2000)); *Knox*, 2014 IL App (1st) 120349, ¶ 46. We may not disturb a sentence merely because we would have weighed the sentencing factors differently. *Id.*

¶ 65    Defendant argues that the trial court erred by failing to consider his rehabilitative potential in imposing sentence. He maintains that the court did not adequately consider the goal of restoring him to useful citizenship where, given his medical condition, his "*de facto*" life sentence effectively negates any possibility of rehabilitation. He points to his age at the time of the offense (25 years old), familial support and employment history as important mitigation evidence illustrating his rehabilitative potential.

¶ 66    After reviewing the record, we find defendant is unable to show that the trial court did not consider the relevant mitigating factors in imposing sentence. At the sentencing hearing, the court heard argument from defense counsel that defendant was the youngest individual involved in the shooting, that his firearm did not discharge, and that he has a medical condition that would be difficult to manage in prison. The court also referenced defendant's PSI report, which contained evidence of the mitigating factors now at issue, including his medical condition, family support and employment history. *Sauseda*, 2016 IL App (1st) 140134, ¶ 19 (we presume the trial court considered all relevant mitigating factors presented to it, absent some indication to the contrary, other than the sentence itself).

¶ 67    During oral pronouncement of the sentence, the court noted in detail that it considered all of these factors. Specifically, the court expressly referenced section 5-5-3.1(a) of the Code of Corrections and individually recited the mitigating factors that applied to defendant's case. See

730 ILCS 5/5-5-3.1(a) (West 2018) (enumerating factors to be considered in mitigation). Regarding factor 12, whether imprisonment would endanger defendant's medical condition, the court found this might apply as defendant had diabetes but noted prisons have medical facilities and Cook County Jail had managed his condition for five years.

¶ 68    The court also reviewed defendant's PSI and explained the report was "interesting" because defendant "had the benefit of a loving family and support." The court continued, pointing out that it would consider that the PSI reflected defendant had three children and suffered from diabetes. In addition, the court spoke at length about defendant's rehabilitative potential, noting that it is "supposed to consider rehabilitation" when considering a sentence, but that the court saw signals that defendant, who had previously been incarcerated, was "given the opportunity to show himself rehabilitating, but it hasn't been the case." The court pointed out that although defense counsel characterized the shooting as "a departure" from defendant's prior criminal cases, "a reasonable person could also conclude" that it was an "upward trajectory of a life of criminality that starts out with smaller things." Thus the record shows the court considered the complained-of mitigating factors.

¶ 69    However, pursuant to its constitutional duty to balance the retributive and rehabilitative purposes of punishment, the court was also required to consider factors in aggravation. *People v. Hearring*, 2022 IL App (1st) 192064, ¶ 44. Because the most important sentencing factor is the seriousness of the offense, the trial court is not required to give greater weight to mitigating factors than the seriousness of the offense. *People v. Harmon*, 2015 IL App (1st) 122345, ¶ 123. The presence of mitigating factors does not require a minimum sentence. *Id.* Nor is the court required

to recite and assign value to each factor it considered, when imposing sentencing. *People .v Williams*, 2019 IL App (1st) 173131, ¶ 21.

¶ 70 The record demonstrates that the court afforded greater weight to the seriousness of defendant's conduct than the mitigating evidence. *Harmon*, 2015 IL App (1st) 122345, ¶ 123. The court noted the impact of defendant's conduct on Ricardo's family. It further noted that it had heard the trial evidence and "got a lot more detail" regarding "the exact steps all along the way of [defendant's] involvement in this." The court pointed out that it was mindful that the evidence did not indicate that defendant's weapon discharged ammunition but found this was not "for any lack of effort" by defendant, who "wanted" and "tried" to shoot Ricardo but was unable to when his firearm malfunctioned. The court recounted that the shooting was a "planned attack" where defendant, Jose, and Edwin had masks and gloves and came prepared to ambush Ricardo, a defenseless victim. Where the evidence established that defendant and his codefendants executed a planned ambush of Ricardo and shot him to death, we cannot say that the mitigating evidence outweighed the seriousness of the offense.

¶ 71 Defendant essentially asks us to reweigh the mitigating and aggravating factors. This we may not do. *Busse*, 2016 IL App (1st) 142941, ¶ 20 (a reviewing court may not reweigh sentencing factors and substitute our judgment with that of the trial court). Given that defendant's sentence is within the statutory range, and he has not shown that the court erred by failing to consider the evidence in mitigation, we find the court did not abuse its discretion and impose an excessive sentence.

¶ 72                                    4.  Forfeiture

¶ 73 Because no error occurred at sentencing, there can be no finding of plain error. See *People v. Williams*, 2025 IL 130779, ¶ 23. Similarly, where the trial court's actions in imposing sentence did not rise to the level of plain error, trial counsel's failure to object did not prejudice defendant and defendant's claim of ineffective assistance of counsel fails. See *People v. Easley*, 192 Ill. 2d 307, 332 (2000). Accordingly, defendant's challenge to his sentence remains forfeited.

¶ 74                    B. One-Act, One-Crime Violation

¶ 75 Defendant next argues, the State concedes, and we agree, that his mittimus erroneously reflects two convictions for first-degree murder, in violation of the one-act, one-crime rule.

¶ 76 Under the one-act, one-crime rule, "a criminal defendant may not be convicted of multiple offenses when those offenses are all based on precisely the same physical act." *People v. Coats*, 2018 IL 121926, ¶ 11. If there is a violation of the rule, a "sentence should be imposed on the more serious offense and the less serious offense should be vacated." *People v. Artis*, 232 Ill. 2d 156, 170 (2009). We review *de novo* whether a violation of the one-act, one-crime rule occurred. *Coats*, 2018 IL 121926, ¶ 12.

¶ 77 Defendant's mittimus reflects two convictions for first-degree murder based on two separate counts: count I, which charged intentional murder under section 9-1(a)(1) of the Criminal Code of 2012 (Code) (720 ILCS 5/9-1(a)(1) (West 2018)); and count II, which charged murder based on acts which the defendant knows "create a strong probability of death or great bodily harm to that individual or another" under section 9-1(a)(2) (720 ILCS 5/9-1(a)(2) (West 2018)).

¶ 78 We agree with the parties that defendant's two convictions concerned the same act, as they both concerned the shooting and killing of the same victim, Ricardo. See *People v. Simmons*, 2016 IL App (1st) 131300, ¶ 175 ("[W]here there is only one victim in a murder case, there can be but

one conviction of murder." (Internal quotation marks omitted.)). Accordingly, defendant could not have been sentenced on both counts, and the two convictions violate the one-act, one-crime rule.

¶ 79     Although not addressed by the parties, we note that defendant's count I conviction for intentional murder is the more serious offense than the count II conviction for strong probability murder. See *People v. Smith*, 233 Ill. 2d 1, 20-21 (2009) (where a defendant is charged with murder in multiple counts alleging intentional, knowing/strong probability, and felony murder, intentional murder is deemed the most serious). Therefore, we vacate defendant's sentence on count II for strong probability first-degree murder. *Artis*, 232 Ill. 2d at 170.

¶ 80     Pursuant to our authority under Illinois Supreme Court Rule 615(b)(1) (eff. Jan. 1, 1967), we order the clerk of the circuit court to correct the mittimus to reflect one sentence for first-degree murder on count I, intentional murder under section 9-1(a)(1) of the Code. See *People v. Smith*, 2016 IL App (1st) 140039, ¶ 19 (the appellate court may correct the mittimus without remanding to the trial court).

¶ 81                          III.  CONCLUSION

¶ 82     For the reasons stated, we affirm the judgment of the trial court and correct the mittimus.

¶ 83     Affirmed; mittimus corrected.